**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **LANCE OLDRIDGE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.: 6:21-cv-1284** |
| **vs.** ) | |
| ) | |
| **CITY OF WICHITA, KANSAS;** ) | |
| **ROBERT LAYTON;** ) | |
| **GORDON RAMSAY;** ) | |
| **WANDA GIVENS;** ) | **Demand for Jury Trial** |
| **JOSE SALCIDO; and** ) | |
| **ANNA HATTER,** ) | **Designation of Place of Trial:** |
| ) | **Wichita, Kansas** |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Lance Oldridge, through counsel Donald N. Peterson, II and Sean M. McGivern

of Graybill & Hazlewood, LLC, and states and alleges for his cause of action against Defendant

City of Wichita, Kansas, Robert Layton, Gordan Ramsay, Wanda Givens, Jose Salcido, and

Anna Hatter:

1.      Plaintiff Lance Oldridge is a citizen of the state of Kansas.

2.      Plaintiff is a Caucasian male.

3.      Defendant City of Wichita, Kansas (the "City") is a government entity,

domesticated in Sedgwick County, Kansas, with the capacity to sue and be sued.

4.      The City of Wichita owns and operates the Wichita Police Department.

5.      Defendant Robert Layton is the City Manager for the City. He is a citizen of the

State of Kansas.

1

6.      Defendant Gordon Ramsay is the Chief of Police for the WPD. He is a citizen of the State of Kansas.

7.      Defendant Wanda Givens is a Deputy Chief of the WPD. She is a citizen of the State of Kansas.

8.      Defendant Jose Salcido is a Deputy Chief of the WPD. He is a citizen of the State of Kansas.

9.      Defendant Anna Hatter is a former Deputy Chief of the WPD. She is a citizen of the State of Kansas.

10.     This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C §§ 1331 and 1367.

11.     Venue is proper in this Court because a substantial portion of the events forming the basis of this suit occurred in this Judicial District.

12.     Plaintiff was employed as a commissioned officer and detective by the Defendant City of Wichita for over 26 years, from July 19, 1993, to April 20, 2020.

13.     On April 20, 2020, Plaintiff was terminated.

14.     Lance Oldridge alleges that his termination was (1) in retaliation for his questions about the activities of City leadership, which was protected by the First Amendment; (2) in retaliation for the actions of his wife, who was the only female out of 30 Lieutenants with the WPD and who raised questions about discrimination in the department; (3) retaliation for reporting corruption issues of public concern with law enforcement agencies, which was protected by the First Amendment; and (4) discrimination and retaliation in violation of Title VII and the Kansas Act Against Discrimination.

*The Ebola Email*

15.     To understand the reasons for the termination, we must look back to a series of

events. The first one began in 2014. During that year, from September 25 to October 13, Mayor

Carl Brewer led a delegation of Wichitans to West and South Africa.

16.     Five weeks before that delegation left for West Africa, the Ebola outbreak in West

Africa had reached the point that it was a matter of international concern. The Centers for

Disease Control Website contains a page on the history of the Ebola outbreak that began in 2014

in Africa. It states:

> On August 8, 2014, WHO declared the deteriorating situation in West Africa a
> Public Health Emergency of International Concern (PHEIC), which is designated
> only for events with a risk of potential international spread or that require a
> coordinated international response. Over the duration of the epidemic, EVD
> spread to seven more countries: Italy, Mali, Nigeria, Senegal, Spain, the United
> Kingdom, and the United States. Later secondary infection, mainly in a healthcare
> setting, occurred in Italy, Mali, Nigeria, and the United States.

https://www.cdc.gov/vhf/ebola/history/2014-2016-outbreak/index.html

17.     In October, while officials were still on the trip to West Africa, Plaintiff sent an

email from his personal email account to Jeff Longwell, a member of the City Council, and

others. Plaintiff raised public safety concerns, noting that "If any of these individuals were to

bring the Ebola virus back to our community (God forbid), especially City Hall, it would cripple

the public service/law enforcement capacity of our city." He further asked "Are the individuals

that return from Africa going to be immediately allowed back to work? Are they going to be

involved in a quarantine/health monitoring period before returning to work? Or are we just gonna

cross our fingers and hold our breath and hope we avert tragedy here . . ." Plaintiff sent the email while he was off duty.

18.     On information and belief, the City of Wichita did not mandate quarantine of individuals returning from the West Africa trip.

19.     The questions raised by Plaintiff in his email were (1) matters of public concern; (2) raised in his capacity as a citizen; and (3) protected First Amendment activity.

20.     Leadership at the WPD never forgot about this email by Plaintiff. Nearly four years later, Defendant Wanda Givens, now a Deputy Chief, was interviewed by the Professional Standards Bureau as part of an investigation of Sarah Oldridge, Plaintiff's wife. During her June 2018 interview, Givens brought up the Ebola email, saying that an email written by Sarah Oldridge reminded her of Plaintiff's Ebola email. Givens stated that when she learned of the Ebola email, her first concern was the potential impact on her husband's business. He had gone on the trip, and she was concerned about the ramifications for her husband's restoration business due to all of the social panic surrounding the Ebola virus.

21.     Givens, a member of command staff since 2016, believes that Lance's email was racist as well.

*The Dahlquist Investigation and Removal from PSB*

22.     In September 2016, as part of his duties at PSB, Plaintiff investigated an alleged hit and run accident involving Officer Dahlquist.

23.     After recently being assigned to PSB by Defendant Ramsay, for several weeks in September and October 2019 Captain Doug Nolte repeatedly suggested Plaintiff should leave PSB and look for another assignment on the department."

24.     On October 21, 2016, Captain Doug Nolte of PSB spoke with Plaintiff about his handling of the investigation.

25.     Nolte told Plaintiff, "If I had to make an observation of you, my observation is that you are fair, you're honest, you're thorough, and those are the things that are putting a mark on you."

26.     On October 27, 2016, Lieutenant Paul Duff of PSB told Plaintiff that someone had reported to Chief Ramsay that Plaintiff had yelled at Officer Dahlquist during a phone call. Duff told Plaintiff that he was now on the Chief's radar, and he should find a position elsewhere in the WPD.

27.     That day, Plaintiff offered to and did provide the audio recording of his phone conversation with Dahlquist to Duff and to Nolte to demonstrate that he had not yelled at Dahlquist. Plaintiff requested an investigation on whoever falsely told Ramsay that he had yelled during the phone conversation, but WPD never conducted one.

28.     On October 28, 2016, Captain Nolte notified Plaintiff that he was being reassigned out of PSB, and that Chief Ramsay had decided the situation with Lance Oldridge was serious enough to open an investigation on him.


*Sarah Oldridge Complaint*

29.     Sarah Oldridge is Plaintiff's wife.

30.     In 2018, Sarah Oldridge was employed by the City as a Lieutenant in the WPD.

31.     In March of 2018, Ms. Oldridge sent an email within the WPD, and copying her private attorney, asking about certain promotion procedures and what the WPD did to eliminate bias from an anonymous survey that had was used by WPD in the process.

32.     Ms. Oldridge sent the email at the direction of City HR.

33.     Blake Mumma, the PSB commander, viewed that email as an attempt to "ridicule" Defendant Ramsay.

34.     Defendant Givens ultimately received the email and forwarded it to many others because she thought it was racist.

35.     Defendant Givens, a key player in Plaintiff's case, believes that Plaintiff wrote the subject email instead of Ms. Oldridge.

36.     The African American man who did receive the subject promotion from Lieutenant to Captain had provided false information on his application about his qualifications.

37.     Plaintiff filed a KORA request in 2018 to obtain information establishing that the gentleman who received the promotion had not provided truthful information on his application for Captain.

38.     Instead of acknowledging that the gentleman provided false information on his application, the City has generated a new application form that would make the individual's answer true if provided in response to the new application form, and then the City has defended its promotion of the gentleman on the basis that the individual's answer is true in light of the new application.

39.     PSB subjected Ms. Oldridge to a ridiculous investigation in which 47 people were interviewed to see how the email made them feel.

40.     Ms. Oldridge has filed EEOC and KHRC charges over this incident.

*Lance Oldridge Complaints About Chief Ramsay Lying Under Oath and to the Public*

41.     On or about January 3, 2015, there was an incident in which a WPD officer shot and killed John Quintero.

42.     Plaintiff was the PSB investigator assigned to investigate that shooting.

43.     Defendant Ramsay reviewed and signed off on the Quintero investigation on April 15, 2016.

44.     Defendant Ramsay, nor anyone acting on his behalf, had conveyed to anyone that Plaintiff had performed poorly or done anything wrong in that investigation.

45.     On May 24, 2019, Defendant Ramsay was deposed in a civil lawsuit filed by the family of Andrew Finch over the so-called "swatting" incident that resulted in Finch's death when he was shot by an officer. During the deposition, Defendant Ramsay was asked questions about a prior officer shooting death of John Quintero.

46.     During the May 24 deposition, in response to a question about the PSB investigation of John Quintero, Ramsay testified that he had removed a Captain, a Lieutenant and two detectives from PSB because they had used leading questions, they were conducting biased investigations and they were contaminating criminal investigations. Defendant Ramsay testified that Plaintiff was the "primary" officer removed from PSB for these alleged violations. That testimony was false. Plaintiff was never counseled about supposed leading questions, biased investigations or contaminating criminal investigations and he was never told he was removed from PSB for leading questions, biased investigations or contaminating criminal investigations.

47.     Concerned that Defendant Ramsay had provided false testimony, in July of 2019 Plaintiff delivered a packet of information to the District Attorney Marc Bennett about the matter and requested an investigation into alleged criminal false communication.

48.     On October 29, 2019, District Attorney Bennett notified Plaintiff that he had discussed Plaintiff's complaint with Defendant Ramsay. Bennett determined that he agreed with Ramsay that Ramsay had not expressed any opinions giving rise to impeachment issues for the officers involved. For this reason, and because it is against the law to criminalize opinions, Bennett determined there were no Brady / Giglio issues arising from Plaintiff's complaint and that there was no criminal false communication to prosecute.

49.     In November 2019, Plaintiff provided information about Defendant Ramsay's false testimony to Sheriff Jeff Easter, asking that it be investigated as perjury. Plaintiff disclosed to Easter that he had already provided the information to the District Attorney who notified Plaintiff he would not investigate the matter for the unique reasons identified above.

50.     On December 4, 2019, Defendant Givens authored a memorandum requesting an investigation of Plaintiff because he had reported Defendant Ramsay to Bennett and Easter for committing perjury.

51.     As a direct consequence of Plaintiff's protected activity, Defendant Salcido authored a memorandum on December 4, 2019, recommending that the WPD investigate Plaintiff for reporting Defendant Ramsay's illegal conduct to Sheriff Easter without revealing that he had previously reported his concerns to the District Attorney.  This was the sole charge made against Plaintiff.

52.     Defendant Ramsay authorized the opening of a PSB investigation into Plaintiff over his protected activities.

53.      Defendant Givens suspended Plaintiff on December 6, 2019, based on his protected activities.

54.     Defendant Givens told Plaintiff that as part of his suspension, he would have to remain at home during work hours.

55.     Others suspended from the City were not required to be confined at home during their suspensions.

56.     On December 9, 2019, Plaintiff filed a complaint with PSB against Defendant Ramsay and Defendant Givens, based upon Ramsay's perjury and their initiation of an investigation of Plaintiff for reporting the perjury to law enforcement.

57.     On December 10, 2019, Defendant Givens filed a complaint with the City alleging that Plaintiff had engaged in racial discrimination against Givens by filing the complaint the day before.

58.     Defendant Givens' complaint was false and malicious, designed to retaliate against Plaintiff for reporting Givens' false PSB complaint a PSB complaint about Plaintiff.

59.     The PSB investigation quickly revealed that Oldridge had in fact disclosed to Easter that he had made a report to Bennett about Ramsay's false statements during the deposition.

60.     Defendant Ramsay dispatched his trusted executive officer, then-Captain Chet Pinkston, to aid in PSB's retaliation against Plaintiff.

61.     Rather than find the charge to be unfounded, the City amended the PSB complaint to include a stale complaint about Plaintiff made five months earlier by an employee who was under investigation.

62.     As part of the retaliatory PSB investigation, Sergeant Jeremy Vogel represented to PSB that he did not coach or mentor Plaintiff for any of his actions while he worked at the training center.

63.     When Sgt. Vogel testified in the grievance hearing for over Oldridge's eventual termination, Vogel testified he "tried to do a lot of coaching and mentoring" so he would not reach the point of formal discipline with Oldridge.  "In fact, there were so many, coaching and mentoring discussions, it would be like a thick novel."  However, Vogel admitted that he never documented any of these discussions.

64.     The City believes Vogel did nothing wrong by providing this utterly inconsistent testimony and the City has not commissioned any investigation into Vogel over his false testimony.

65.     Deputy Chief Hatter was the nominal decision maker for the WPD on the complaints made about Lance Oldridge. Her decision to fire Lance Oldridge was based upon, and expressly referenced, his communications with outside law enforcement agencies about official misconduct by Chief Gordon Ramsay.

66.     City Manager Robert Layton was the final decision maker for the City of Wichita. The March 26, 2020, memo memorializing Layton's rationale for terminating Lance Oldridge was based upon, and expressly referenced, his communications with outside law enforcement agencies about official misconduct by Chief Gordon Ramsay.

67.     The City of Wichita further retaliated against Plaintiff by opposing his unemployment application for the same reasons that it terminated Plaintiff.

## *Cause of Action and Prayer for Relief*

68.     Defendants City of Wichita, Layton, Ramsay, Salcido, Hatter, and Givens violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

69.     Defendant City of Wichita violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and the Kansas Act Against Discrimination.

70.     Plaintiff has exhausted all required administrative remedies.

71.     Plaintiff has been damaged as a result of the City's unlawful conduct.

WHEREFORE, Plaintiff Lance Oldridge prays that judgment be entered in his favor and against Defendants City of Wichita, Kansas, Michael Layton, Gordon Ramsay, Jose Salcido, Wanda Givens, and Anna Hatter, for damages in excess of $75,000.00, representing economic damages, noneconomic damages, compensatory damages, punitive damages, and for attorney's fees, expenses, and for equitable relief as allowed by law.

### Demand for Jury Trial

Plaintiff Lance Oldridge hereby demands a jury trial.

### Designation of Place of Trial

Plaintiff Lance Oldridge hereby designates Wichita, Kansas as their place of trial.

Dated: December 1, 2021

GRAYBILL & HAZLEWOOD, LLC

/s/ Donald N. Peterson, II
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932
218 N. Mosley St.
Wichita, KS 67202
Telephone: (316) 266-4058
Fax: (316) 462-5566
don@graybillhazlewood.com
sean@graybillhazlewood.com

*Attorneys for Plaintiff*