**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| LANCE OLDRIDGE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 6:21-cv-01284-EFM-KGG |
| | ) | |
| CITY OF WICHITA, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**<u>Introduction</u>**

Plaintiff Lance Oldridge claims Defendants are responsible for the termination of his position as Detective with the Wichita Police Department because (1) it was in retaliation for his reports of criminal conduct (false sworn testimony) by the Chief of Police and (2) those reports were protected by the First Amendment as a petition to the Government for redress of grievances. Oldridge also claims the City of Wichita is liable under Title VII (and the Kansas Act Against Discrimination) because his termination was motivated, at least in part, by his race (Caucasian) and in retaliation for his wife having filed complaints of her own. Defendant Givens is also individually liable for violating Oldridge's Equal Protection rights. In an unusual move, Defendants have moved for Summary Judgement even before any discovery has been conducted. Defendants' motion rests on a misapprehension of the law and should be denied.

Because Defendants' Memorandum refers to the First Amendment over 50 times but at no point quoted it, let us begin with its language:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the

right of the people peaceably to assemble, ***and to petition the Government for a redress of grievances***.[1]

First Amendment to the United States Constitution (emphasis added).

Reporting a crime to law enforcement is an archetypical petition to the government for redress of grievances.  The Tenth Circuit has put it this way: "We thus conclude that 'filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right' to petition the government for the redress of grievances. [citation omitted]" *Meyer v. Board of County Com'rs*, 482 F.3d 1232, 1243, n.5 (10th Cir. 2007).  Given how important this right is, it is not surprising that the Supreme Court has made clear that "the First Amendment bars retaliation for protected speech."  *Crawford–El v. Britton*, 523 U.S. 574, 592 (1998).

Defendants' Motion seeks dismissal of each defendant, arguing that "the speech at issue (Plaintiff's secret communications with the D.A. and Sheriff regarding Ramsay's purported crimes) was not on a matter of public concern but was rather personal to the Plaintiff." (Memorandum, Doc. 32, p. 19).  As discussed below, however, that just is not the law.  "As we have held many times, speech reporting the illicit or improper activities of a government entity, or its agents is obviously a matter of great public import." *Casey v. West Las Vegas Ind.  School Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007).  Further, the fact that Oldridge reported criminal activity via "a private forum," i.e., the D.A. and the Sheriff, rather than "a public forum," that does not remove the speech from First Amendment protection."  *See Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1202 (10th Cir. 1998); *Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1999)

Defendants' Motion ignores that the First Amended Complaint also addresses other protected speech.  Specifically, paragraphs 15-21 discuss an email sent by Lance Oldridge in 2014 as a private citizen to Jeff Longwell, who was on the City Council, about whether appropriate

---

[1] The First Amendment applies to the States because of the 14th Amendment.

precautions were being taken with respect to a City delegation to Africa during the Ebola outbreak. Wanda Givens, who later became a Deputy Chief, was very upset by that email, believing it to be racist. She has brought that email up years later as having been racist. Wanda Givens was the person who reported Lance Oldridge to Professional Standards Bureau after Lance Oldridge reported the Chief's testimony to Marc Bennett and Sheriff Easter. Plaintiff alleges that one reason Givens was motivated to report Oldridge was the Ebola email. Defendants' Memorandum simply ignores this component of Oldridge's First Amendment claim.

Defendants' Motion also seeks dismissal of all defendants arguing that "the City's interests as an employer in promoting efficient public service outweighed Plaintiff's interest in making a false accusation to outside law enforcement officials about Ramsay." (Memorandum, Doc. 32, p. 19). Although this ultimately is a question for the Court, the Court can only address this issue if it is presented sufficient underlying facts. As described below, Plaintiff intends to conduct discovery on this subject. In support of this "outweighed by" argument, Defendants describe Oldridge's allegation as "false on its face." (Memorandum, Doc. 32, p. 22). It is not false on its face. Any inquiry into whether it was true or false is an issue of fact that requires discovery.[2] In any event, Oldridge reported the crime without fanfare (described as "secret" by defendants), so it is hard to see how the report by itself could have caused problems with the administration of the WPD police function.

Each individual defendant seeks qualified immunity on other grounds unique to some or each of them. As explained below, these individual issues each raise classic fact questions that

---

[2] It is unclear whether Defendants are attempting to raise an argument that Oldridge's reports do not merit First Amendment protection because they were not made in good faith (i.e., without an honest belief that they were justified or were made for some improper purpose). In any event, it appears that any such position is an affirmative defense on which Defendants would bear the burden of proof, and thus is not appropriate for summary judgment. Whether a person acted in good faith is a question of intent that requires a jury to see and hear the witness.

must be addressed in discovery.  The City of Wichita argues it is entitled to summary judgment regarding the Title VII claims.  In doing so, the City fails to read the Amended Complaint in its entirety.  Doing so, it is clear that the Amended Complaint states a claim.

For these and other reasons explained more fully below, this Court should reject Defendants' invitation to grant summary judgment before Plaintiff has had the opportunity to conduct discovery.

### Plaintiff's Response to Allegations of Fact

Plaintiff responds to Defendants' statements of fact as follows for purposes of this Motion:

The following are uncontroverted: 1-21; 25; 27-29; 39.

22.     Responding to Plaintiff on October 29, 2019, the District Attorney first addressed the likely unconstitutionality of the Kansas criminal libel statute relied upon by Plaintiff:

> Before a formal investigation into the Chief would take place, I needed to satisfy myself that evidence existed to suggest that a crime had been committed to warrant such an investigation. That's why I did not ask you to file a police report with the Sheriff's Department before I had a chance to look at this in context. My hesitation is based on several factors.  The first is that the constitutionality of criminal libel statutes has been successfully challenged in the past. In *Mink v. Knox*, a state prosecutor from Colorado who sought a search warrant based on that state's criminal libel stature lost her immunity because (summarized) the 10th Circuit held the prosecutor should have known the antiquated statute was unconstitutional under the 1st amendment.  It didn't' allow for the expression of political opinions and criminalized satirical statements about the conduct of others.  Just last Friday, the Kansas Supreme Court struck down the "reckless" element of the Criminal Threat statute in our state as unconstitutional because it violated the 1st Amendment.

(Bennett's email to Pl., 10-29-19, in Exh. 8; Arb. Hearing, Pl's testimony, pp 682-683, 686, 750, 852, 856, Exh. 1)

**Uncontroverted in part, controverted in part.  Uncontroverted that Bennett included this statement in his email.  In the body of their brief, Defendants state the DA told Oldridge that his allegation was "false on its face."  Def.s' Br. p. 22 (Doc. 32).  To the extent Defendants rely on the above language by Bennett as support for the "false on its face" description, Oldridge controverts that description.**

23.     District Attorney Bennett next advised Plaintiff that Bennett had spoken to Chief Ramsay about Ramsay's deposition testimony. Analyzing the evidence, Bennett had now concluded that Ramsay did not commit any crime in stating Ramsay's opinions regarding the former PSB employees:

> As part of my ongoing obligation with respect to Brady/Giglio assessments, as I said above, I've spoken to the Chief about this matter.  He confirmed what seemed clear to me when I read the full deposition- that his comments reflected his opinion that certain PSB investigators assigned to that division when he took over, were harder on younger, less experienced cops during their investigation. He did not express any concerns that indicated he held the opinion that any of the PSB investigators suffered from impeachment issues, which is consistent with his subsequent public media release after the fact.  While you may have facts that contradict his opinions, or facts or witnesses that may even call his opinions into serious question- they are still his opinions.  Opinions which he has not disavowed.   As set forth above, criminalizing opinions is an untenable pursuit.

(Bennett's email to Plf., 10-29-19, in Exh. 8)

**Uncontroverted in part, controverted in part.  Uncontroverted that Bennett included this statement in his email.  In the body of their brief, Defendants state the DA told Oldridge that his allegation was "false on its face."  Def.s' Br. p. 22 (Doc. 32).  To the extent Defendants rely on the above language by Bennett as support for the "false on its face" description, Oldridge controverts that description.**

24.     On or about November 18, 2019, Plaintiff delivered a ten-page letter to the Sedgwick County Sheriff, Jeffrey Easter, along with the Ramsay deposition excerpts and other related materials.  Plaintiff asserted to the Sheriff that Chief Ramsay had committed the crime of perjury in Ramsay's deposition.  Plaintiff requested that the Sheriff's Office "conduct a complete and thorough investigation" of Ramsay for that crime. (Arb. Hearing, Pl's testimony, pp. 686-690, 750, 809-810, 827-828, 835, 852-854, 889-890, in Ex 1; Pl's letter to Easter, 11-18-19, in Exh. 9).

**Uncontroverted in part, controverted in part.  Controverted in that the Sheriff requested documentation from Oldridge and Oldridge provided documents in response to the request.  L. Oldridge Decl., ¶ 31.**

26.     Sheriff Easter himself then contacted District Attorney Bennett regarding the matter. On November 22, 2019, Bennett wrote Easter regarding Plaintiff's claim that Chief Ramsay had committed the crime of perjury:

> As set forth in the *Rollins* decision, to sustain a perjury charge, the perjured testimony must be "material." The deposition in question was given in a civil suit arising from the shooting death of Mr. Finch and the plaintiff's allegation that the response to the swatting call was mishandled by the WPD.  The chief's opinions that, two years prior to the swatting case, he wanted to change the philosophy of PSB when he took over the department and the reasons he gives for that determination are not facially material to what happened the night of the Finch shooting.

(Bennett's email to Easter, 11-22-19, in Exh. 10)

**Uncontroverted that this is an accurate quote from the email.  Controverted that the substance of the email is accurate.  The Finch case focused *significantly* on PSB, and the veracity of Ramsay's statements about PSB are material to those proceedings.  *See*, *e.g.*, *Finch v. Rapp*, Memorandum and Order, Case No. 18-1018-JWB, 2020 WL 3403121, \*5-8 (6/19/2020), *aff'd*, __ F.4th __, 2022 WL 2431586 (10th Cir. 7/5/2022).  On May 17, 2022,**

Ramsay wrote a letter to the City Council and Mayor stating that there is unethical and inappropriate conduct in WPD disciplinary matters due to *city administration*. Ramsay further alleged in the letter that he has witnessed "past requests for information manipulated, information left out and consultant reports changed to fit the requested narrative." Ramsay recently urged an independent audit of WPD practices. Ramsay 5/17/2022 letter (Ex. 23).

30.     On November 14, 2019, the three Deputy Chiefs (Defendants Hatter, Salcido and Givens) met with Bennett themselves and Bennett again stated no crime had been committed. Defendant Salcido mistakenly believed at that time (as expressed in his memo) that Plaintiff had not advised Sheriff Easter of Plaintiff's prior communications with District Attorney Bennett. (Salcido's memo, 12-4-19, in Exh. 12; Arb. Hearing, Hatter's testimony, pp. 377-379, in Exh. 19).

Controverted.  A jury could conclude this was not just a mistaken belief, but a manufactured justification to investigate Oldridge knowing the allegation was false. These are professional investigators who had access to everyone needed to determine what Oldridge in fact told Easter.  Even when Oldridge provided proof that he had informed Easter of his prior communications with Bennett, that did not stop the PSB investigation. Instead, leadership modified the allegations to justify keeping the investigation open. (see SOF 57).  Salcido wrote "I reasoned that Det. Oldridge knowingly and with reckless indifference departed from the truth when reporting the fact pattern to Sheriff Easter since it was evident from the details the Chief relayed to me on November 13, 2019, that Det. Oldridge did not disclose to Sheriff Easter that Marc Bennett had already reviewed the Chief's deposition."  Doc. 32-12, p.1.  Salcido's memo then predicts that Oldridge would go

to the media and that the WPD needed a memo from Marc Bennett for when that happened. **Id.  This was all very strategic.**

31.     After the three Deputy Chiefs met with District Attorney, they met and discussed the matter among themselves. It was decided that Givens and Salcido would request that a PSB investigation be initiated while Hatter would step back from the investigation until it was completed.[3] (Arb. Hearing, Hatter's testimony, pp 380-383, in Exh. 19)

**Controverted.  Hatter was involved in the investigation, though she testified that she was not.  She authored a "Memo for Record" dated March 9, 2020, where she wrote about requesting an "update" on the investigation from Blake Mumma, and her involvement in interviewing witnesses in the investigation.  Hatter 3-09-2020 Memo for Record (Ex. 24).**

32.     Deputy Chief Anna Hatter had worked as a police officer, detective, Sergeant, Lieutenant, Captain and finally Deputy Chief for about 25 years. As Deputy Chief, she had the authority to administer discipline after a PSB investigation was completed. (Arb. Hearing, Hatter's testimony, pp 367-369, in Exh. 19).

**Controverted.  The PSB Standard Operating Procedure states that the Chief of Police makes these decisions.  PSB SOP, pp. 18-19 (Ex. 25) (stating that Chief of Police makes decision on discipline).**

33.     Hatter had no problem with Plaintiff Oldridge's contact with District Attorney Bennett regarding Chief Ramsay. The problem as Hatter saw it was that after Bennett explained to Plaintiff the legal reasons Bennett was not going to prosecute, Plaintiff went to the Sheriff anyway. Even if the Sheriff investigated, the decision whether or not to prosecute would still be the District Attorney's. (Arb. Hearing, Hatter's testimony, pp. 380-381, in Exh. 19)

---

[3] Defendant Hatter has left City employment since the events alleged in this case.

**Controverted. The best evidence of the complaint that Hatter, Salcido, and Givens decided should be filed is Givens' complaint that was filed after their meeting. Givens' complaint says nothing of this, only that Oldridge should be investigated because he complained about Ramsay's false testimony to both the DA and the Sheriff. Givens 12/4/2019 Memo (Doc. 32-13). Second, Salcido's 12/4/2019 memo for record claims that Oldridge tried to sabotage the department by failing to disclose that Bennett had already passed on the matter. (Doc. 32-12). Further, Bennett's analysis was limited to the criminal libel statute, and he declined to use it because he reported it had been held unconstitutional and that Ramsay's testimony about the specific things that Oldridge did that caused him to be removed from PSB were merely opinons. Bennett 10/29/2019 email (Doc. 32-8). Bennett did not analyze the perjury statute. *Id.* From all of this, a jury could conclude that Hatter in fact did not actually believe what she now says she believed.**

34. On December 4, 2019, Deputy Chief Wanda Givens made a written request that a PSB internal investigation be initiated regarding Plaintiff's actions in contacting District Attorney Bennett and Sheriff Easter concerning alleged crimes committed by Chief Ramsay. Defendant Givens also suspended Plaintiff with pay while the investigation proceeded.[4] (Givens' report, 12-4-19, in Exh. 13; Arb. Hearing, Hatter's testimony, pp. 383, in Exh. 19; Arb. Hearing, Pl's testimony, pp. 686-698 in Exh. 1).

**Controverted in that Blake Mumma issued opening letters for the PSB investigation on December 2, 2019. 12-2-2019 Official Notification of Administrative Internal Investigation (Ex. 26). Otherwise, it is uncontroverted that Givens pursued an investigation**

---

[4] Defendant Givens has left City employment since the events alleged in this case.

of Oldridge for reporting criminal activity to the DA and the Sheriff, and that she suspended Oldridge due to her complaint against him.

35.     A PSB investigation regarding Plaintiff was conducted by Lt. Blake Mumma from December 2019 to April 2020. Plaintiff does not contend that Lt. Mumma was influenced by any external pressure during Mumma's PSB investigation. Mumma's final investigation report was 168 pages in length. (Arb. Hearing, Pl's testimony, pp 790-791, in Exh. 1; Arb. Hearing, Hatter's testimony, pp 372-375, 385-387 in Exh. 19)

**Controverted in that (i) Lance Oldridge testified that he believes there was pressure put on Mumma before the investigation (see Doc. 32-1, pdf page 28), and (ii) Hatter intervened in the investigation on at least one occasion despite testifying that she did not (see response to SOF No. 31).**

36.     On March 19, 2020, Deputy Chief Hatter sent Plaintiff a very detailed 8-page letter outlining all of the policy violations that the investigation found. Further, Hatter specifically outlined Oldridge's rights to a due process hearing to explain his side of the events that led the WPD to conclude that he had committed seven distinct terminable offenses. (Arb. Hearing, Pl's testimony, pp 873-875, in Exh. 1; Arb Hearing, Hatter's testimony, pp. 387, 398, 409-415, in Exh. 19).

**Uncontroverted that the letter includes these statements.  The substance of the letter is controverted.  First, Hatter, Salcido, and Givens decided to open an investigation on Oldridge over his reports to the DA and the Sheriff.  They did this with the permission of Defendant Ramsay.  When Oldridge quickly disproved the allegation (by providing documents showing he had disclosed to the Sheriff that the DA had already declined to prosecute criminal libel)  the PSB investigation continued, just with a new different charge.**

**This is consistent with Chester Pinkston's testimony that PSB discipline is malleable depending on what the public may learn (McGivern Decl., ¶ 4(f)).  That was an issue here, where the Deputy Chiefs took punitive action after discerning Oldridge may notify the media.  Second, discovery will show further issues bearing on Hatter's credibility and the credibility of the PSB process at WPD.  McGivern Decl., ¶ 4(i) (Hatter signed a letter sustaining Kelly Mar two weeks before she reviewed the file; Hatter didn't write the letter, Chet Pinkston wrote it; letter contained false information; Lem Moore, not Hatter, made the decision to sustain Mar); § ¶ 4(k) (Hatter sustained Kris Henderson (African American) for lying to PSB because ample evidence supported it; then Hatter un-sustained him within hours); ¶ 8 (Ramsay sending letter to City leaders about corrupt practices concerning PSB discipline and altered documents); McGivern Decl. ¶ 4(j) (Givens and Mumma set up a fake PSB file to research and identify the individuals who disclosed to City Council that WPD held a racially segregated meeting in the summer of 2020).**

37.     On March 30, 2020, Deputy Chief Hatter wrote a memo to the City Manager, Robert Layton. Defendant Hatter recommended to Defendant Layton that Plaintiff's employment be terminated. The basis for this recommendation was not Plaintiff's decision to report what he believed to be "illegal" conduct by Chief Ramsay. Rather, Hatter summarized the significant factual record showing that Plaintiff continuously and repeatedly used language with co-workers that was derogatory and debasing of Chief Ramsey. In addition, in 2017, Oldridge signed an agreement with the City that he would *only* use his own personal PSB documents from his "yelling at his supervisor" investigation in furtherance of the grievance of that discipline. Oldridge knowingly broke that agreement when he took confidential personnel records and investigation documents to Sheriff Easter. Finally, Hatter found that Oldridge was untruthful in his interview

with Lt. Mumma during the 2020 investigation. (Arb. Hearing, Hatter's testimony, pp 418-421, in Exh. 19; Hatter memo to Layton, 3-30-20, in Exh 14; Arb. Hearing, Pl's testimony, pp. 794-798, Exh. 1)

**Controverted.  Hatter has a history of signing letters she did not author. (cite).  Thus, discovery is needed to get to the bottom of who authored the letter.  Further, the substance of the letter is controverted.  For one thing, some of the conclusions are implausible on their face and could be seen by a jury as part of an attempt to find anything that might justify punishment.  The letter claims Oldridge having supplied an email that had insignificant parts redacted in black (so that the redaction was obvious) was somehow dishonest conduct.  Furthermore, the day after his PSB interview, on his own initiative, Oldridge came in to clarify one point of his testimony.  The letter declared this dishonest as well.  When this is compared to actual dishonest conduct that is ignored by WPD leadership (e.g., Jeremy Vogel's changed testimony (SOF 66-67); Wendel Nicolson's false application for promotion (SOF 48) this claimed conclusion appears to be predetermined).  To the extent Hatter indeed is the author, see response to SOF 36.**

38.    Chief Ramsay never made any attempt to influence the PSB's investigation or Hatter's ultimate recommendation that Plaintiff's employment be terminated. (Arb. Hearing, Hatter's testimony, pp 426-428, in Exh. 19).

**Controverted.  Ramsay was consulted about opening an investigation into Lance Oldridge solely over his reports to the DA and the Sheriff about Ramsay.  He agreed to let his deputy chiefs run with the investigation, which resulted in Oldridge's termination.**

40.    Plaintiff filed a grievance regarding his termination. A four-day arbitration hearing was held in December 2020. Eight witnesses were called to testify under oath or affirmation and

more than 50 exhibits were entered and discussed.   Plaintiff Oldridge was represented at the hearing by legal counsel provided by the Fraternal Order of Police (FOP).   A court reporter was present and later prepared a transcript of the proceedings. (Arbitration transcript cover pages in Exh. 16).

**Uncontroverted.  Plaintiff points out, however, that the issues for the arbitration are different than the issues in this case, and that the discovery in that action was quite limited.**

41.     On April 28, 2021, Defendant Layton (City Manager) upheld the Arbitrator's findings that Plaintiff Oldridge had violated WPD policies and that there was just cause for his termination. However, Layton disagreed with the Arbitrator's recommendation of reinstatement and a lesser penalty. Layton sustained Plaintiff's employment termination. (Layton letter to Pl., 4-28-21, in Exh. 17).

**Uncontroverted.  Plaintiff points out, however, that the issues for the arbitration are different than the issues in this case, and that the discovery in that action was quite limited.**

42.     On March 25, 2022, a state court judge upheld the City Manager's decision to terminate Plaintiff's employment after Plaintiff appealed that decision.  The court found that the City Manager's decision was neither arbitrary nor capricious.  Moreover, the justification for Plaintiff's employment termination was supported by substantial evidence. (Journal Entry of Judgement 3-25-22, *FOP v. City of Wichita*, Case No. 21-cv-1364), in Exh. 18)

**Uncontroverted that the state court entered these findings and accordingly dismissed the arbitration appeal.  Plaintiff points out, however, that the issues for the arbitration are different than the issues in this case, and that the discovery in that action was quite limited.**

**<u>Plaintiff's Statement of Additional Facts</u>**

Plaintiff offers the following material facts in opposition to Defendants' Motion.  Some facts cited from the declarations may require further discovery to substantiate, and Plaintiff would request leave to take discovery pursuant to Fed. R. Civ. P. 56(d).

43.     Ramsay and his executive staff (deputy chiefs and executive officer) met twice weekly to discuss, among other things, employee disciplinary matters.  McGivern Decl., ¶¶ 4(b), (c).  Ramsay leaned heavily on Chet Pinkston for help with disciplinary matters. *Id.*, ¶¶ 4(d), (e).

44.     The PSB works directly for the chief of police.  McGivern Decl., ¶ 4(h).

45.     Chet Pinkston testified that WPD mitigates officer discipline depending on whether the public may learn of the officer's misconduct.  McGivern Decl., ¶ 4(f).  Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, SOF 188-90, pp. 49-50.

46.     Under Gordon Ramsay's tenure, an officer booked tee times under false names at City of Wichita golf courses, so he and his friends could play a faster round of golf.  Though the conduct involves dishonesty towards the City, Chet Pinkston testified that the City hit the officer with a B penalty for judgment, because the Parks Department didn't want to make a big deal out of it.  McGivern Decl., ¶ 4(n), Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, SOF 191-94, p. 50.

47.     In October 2016, Oldridge investigated an officer-involved hit and run accident that occurred off duty.  On 10/21/2016, PSB commander Captain Nolte told Oldridge: "my observation is that you are fair, you're honest, you're thorough, and those are things that are putting a mark on you."  Oldridge was investigating the accident and someone from outside PSB cancelled his interview with the focus officer.  Oldridge yelled at his supervisor Lt. Paul Duff on 10/25/2016 over this interference.  Duff and Oldridge discussed the issue over lunch and agreed to keep it in house.  Three days later Oldridge was transferred out of PSB.  Oldridge Decl., ¶¶ 8-14.

48.     Sarah Oldridge, Oldridge's spouse, is a former Lieutenant with the Wichita Police Department.  Just prior to and following Oldridge's removal from PSB, Sarah participated in two promotional processes for the rank of Captain but was not promoted.  In 2018, a federal lawsuit was filed on her behalf regarding circumstances surrounding the process and reported discrimination.  Sarah was subject to a vicious investigation, in which the PSB interviewed 47 people about an email that Sarah had sent asking why someone who did not meet the stated qualifications was promoted, and how WPD would filter out bias if it was using SurveyMonkey to seek information about candidates for captain. Wendell Nicholson had been promoted to Captain though he did not have 1 year of experience as a lieutenant at the time he applied.  During the lawsuit, the City produced a fabricated application for Nicholson, revised to ask whether he would have one year of experience as a lieutenant by the time he was promoted to captain.  Oldridge Decl., ¶ 16.   Gordon Ramsay usually becomes aware of employee discrimination complaints.  McGivern Decl., ¶ 4(o).

49.     Wanda Givens, African American, reported to WPD PSB that she believed Lance Oldridge authored Sarah Oldridge's email about the fact that Wendell Nicholson did not meet the stated qualifications to be a captain at WPD.  She discerned this because the structure or style of the email was similar to the one that Lance Oldridge wrote to City Council about the Ebola issue in 2014. Givens believes that Lance Oldridge's Ebola email is racist and that Sarah Oldridge's email about the captain promotion cycle is racist.  McGivern Decl., ¶ 4(a).

50.     Oldridge's 2014 email about the Ebola is attached as Ex. 22.  Oldridge Decl., ¶ 3.

51.     On July 11, 2019, the Wichita Eagle newspaper printed an Associated Press article titled, "Wichita Chief Concerned About Police Shooting Investigations."  Oldridge Decl., ¶ 18.  Plaintiff incorporates by reference the text of this article, which is filed at Doc. 32-3.

52. On November 12, 2019, Oldridge spoke on the telephone to Sedgwick County Sheriff Jeff Easter. He told Sheriff Easter that Chief Ramsay had lied in a sworn deposition on May 24, 2019, and that he was making a formal complaint to him on the crime of perjury committed by Chief Ramsay. Oldridge disclosed that he had made a complaint of Criminal False Communication, a misdemeanor, recently to DA Bennett regarding the false testimony and that DA Bennett declined to file charges against the Chief for that crime. Sheriff Easter said he would need to discuss the new allegation with DA Bennett and would be in touch. Oldridge Decl., ¶ 28.

53. On November 15, 2019, Sheriff Easter telephoned Oldridge and said he had spoken with DA Bennett about his allegation. Sheriff Easter requested that Oldridge provide him with the evidence he had regarding the perjury complaint. This was on a Friday, and Oldridge told Sheriff Easter that he could have all the information to him on Monday (11/18). Oldridge Decl., ¶ 29.

54. Oldridge's emails to Sheriff Easter took place while he was off duty and from his personal email account. Oldridge Decl., ¶ 31.

55. On December 6, 2019, Oldridge received an Official Notification of Administrative Internal Investigation from Defendant Givens. A true and accurate copy of this document is attached as Ex. 26. Oldridge Decl., ¶ 34. During this encounter, Oldridge told Givens that the allegation in the notice – failure to notify the Sheriff of prior discussion with the DA – was false. *Id.*, ¶36. Givens placed Oldridge on indefinite administrative leave and required him to be at his residence Monday through Friday, 8 to 5, and that Oldridge could only leave his house from noon to 1pm. This requirement was different from past practice which required employees to be available by phone during work hours. Oldridge Decl. 38.

56. The sole basis for Deputy Chief Givens' complaint against Oldridge stated, "Even though Detective Oldridge received DA Bennett's finding prior to contacting Sheriff Easter, he

still presented the incident as criminal and did not inform Sheriff Easter of DA Bennett's previous review and ruling."  The official notification listed 21 witnesses for the allegation.  Of course, it listed DA Bennett and Sheriff Easter, but the other 19 witnesses were Oldridge's current co-workers and supervisors, as well as a former co-worker who left the department around May 2019. Oldridge questioned how those witnesses would know anything about his conversations with DA Bennett and Sheriff Easter.  Specifically, witnesses 1 and 2 were relevant to the charge of communicating conduct of Chief Ramsay to outside third parties.  The rest had nothing to do with his reports of Chief Ramsay's criminal conduct.  Oldridge Decl., ¶ 37.  The former coworker who the City intended to interview left the WPD over his assault of a female coworker, as referenced in the Wichita Eagle, "Former Wichita police detective granted diversion after sexual harassment allegation," 10/3/2019, is attached as Exhibit 27." Oldridge Decl., ¶ 42.

57.     Oldridge (through the FOP) provided documents to PSB on December 9, 2019, to demonstrate that he had, in fact, informed the Sheriff what the DA had told him in response to the criminal false communication complaint.   Oldridge Decl., ¶ 43.  PSB lieutenant Mumma had told Oldridge's FOP representative that it would not be up to him whether the complaint could be dropped after Oldridge provided evidence refuting the charge. *Id.*, ¶ 41.

58.     Oldridge (through FOP) delivered a complaint to PSB about Wanda Givens (for initiating investigation of him over protected activities) and Ramsay (for providing false testimony about Oldridge and his peers in PSB), on December 9, 2019.  Oldridge Decl., ¶ 43.

59.     Givens submitted a race discrimination complaint against Oldridge to Defendant City on December 10, 2019, in reprisal for his complaint about her.  Oldridge reported this to HR, where nothing happened.  Oldridge Decl., ¶ 70-76

60.     On December 16, 2019, Oldridge was served with a second Official Notification of

Administrative Internal Investigation, reflecting that the charges against him had been amended. A true and accurate copy of the 12/11/2019 Official Notification of Administrative Internal Investigation is attached as Ex. 28.   Oldridge Decl., ¶ 44.  This amended notice a) removed the allegation that Oldridge failed notify the Sheriff of the DA's correspondence, and b) added a general allegation that Oldridge engaged in conduct to discredit the WPD without regard to his obligations as an officer (an F-penalty or terminable offense).  Oldridge Decl. 44.

61.     During the review of the witness interviews prior to Oldridge's interview, he learned that several witnesses were asked a line of questioning about him trying to move unqualified applicants through the hiring process in my position as a pre-employment/background detective.  They asked if Oldridge ever suggested hiring someone who would cause problems or harm to the Department or cause chaos.  They also asked if Oldridge said or suggested anything about removing documents from an applicant's file so someone could be hired.  The question was also asked of one of Oldridge's co-workers if Oldridge suggested losing a document to get someone hired, and if they knew of Oldridge doing things like this to harm the Chief.  Oldridge Decl., ¶ 62.

62.     On January 30, 2020, Mumma told Oldridge that Rick Craig had offered to provide ostensibly derogatory information about Oldridge back in May of 2019 when Craig himself was under investigation, but Mumma refused it.  Oldridge asked why WPD only began investigating the information Rick Craig provided now, and Mumma stated "they" didn't investigate it at the time they believed Craig wasn't credible.  Oldridge Decl., ¶ 62.

63.     In the PSB file for the December 2019 charges against him, Oldridge discovered a copy of a KORA request that he had made in September 2019.  The copy of my KORA request in the case file had a note on it that said, "From DC Givens for Oldridge case - Thanks!"  The copy

was stamped as received in PSB on January 17, 2020. Oldridge Decl., ¶ 64.

64.     On March 10, 2020, Anna Hatter prepared a "Memo for Record" discussing her participation in the PSB investigation of Oldridge. Memo for Record 3-10-2020 (Ex. 24). Oldridge Decl., ¶ 66.

65.     In his final report about the matter, dated March 16, 2020, PSB commander Mumma discussed Sarah Oldridge's lawsuit against the City and referred to her underlying email as her attempt to "ridicule" Chief Ramsay. A true and accurate copy of page 1 and 26 of the PSB commander Mumma's report about me is attached as Ex. 29 (Mumma Officer Report 3-16-2020, p. 26). Oldridge Decl., ¶ 66. A true and accurate copy of Sarah Oldridge's 3/8/2019 EEOC Charge is attached as Exhibit 30. Oldridge Decl., ¶ 16.

66.     The final reasons for terminating Oldridge were trumped up and unsupported. For example, one example of lying/deceit that PSB cited against Oldridge, was redacting with a black marker information that he provided to PSB. That is far from dishonest or deceitful. Oldridge voluntarily provided information to PSB and was focusing them on relevant information by redacting other information, and PSB was aware of the information that was redacted. Oldridge Decl., ¶ 69.

67.     Sgt. Jeremy Vogel (Asian American) was Oldridge's direct supervisor at the Training Academy. He testified at Oldridge's arbitration that he "tried to do a lot of coaching and mentoring" so he would not reach the point of formal discipline with Oldridge. Lance Oldridge Arbitration Hearing Transcript 12-9-2020 at tr. p. 354 (Ex. 31).; When asked, "Did you write down or make notes about your discussions with Mr. Oldridge?", Vogel responded: "No, I didn't because it was too numerous, and if I did over the course of the time that I had supervised him, it would be like a thick novel." *Id*. After the arbitrator ordered the City of Wichita to rehire Oldridge, the City

refused to do so, citing "the repeated mentoring [I] received by Sergeant Vogel in the Training Center." Manager Letter Refusing to Reinstate Oldridge 4-28-2021 at 2 (City Ex. 17).  But when Oldridge was the subject of the PSB investigation in December 2019, Sgt. Vogel reported that he had never "coached" or "mentored" me for his actions and did not see any issues. PSB Interview of Jeremy Vogel re Lance Oldridge 12-16-19, pp. 5-6 (Ex. 32).  Oldridge Decl., ¶¶ 78-81.

68.     Deputy Chief Chet Pinkston testified that Vogel's statements were inconsistent, and he "does not know why [Vogel] changed from one statement of no instances that he recalls to this was constant and ongoing, which was more consistent with what we found from the investigation, that Detective Oldridge's conduct was constant and ongoing." Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, p. 48.  Despite that, Pinkston testified he does not see Vogel's inconsistent testimony as a matter for PSB.  *Id.*, pp. 48-49.  Oldridge Decl., ¶ 81.

69.     An anonymous source began texting Oldridge in December 2021.  Oldridge Decl., ¶ 82.  The source appears to be reliable as it has notified Oldridge of significant misconduct at WPD before it becomes public.  *Id.*, ¶¶ 83, 84, 86, 90, 104 (discussing WPD's attempt to suppress a survey conducted about the department, its forensic search to find out who criticized WPD management in the survey; and the ultimate publication of the story in the media); *Id.*, ¶¶ 87, 89 (stating Captain Stephens was sustained for referring to black people as baboons and eventual disclosure of this event in Citizen Review Board minutes); *Id.*, ¶¶ 91, 100, 101, 102 (stating Ramsay and management sat on complaints about Mia Turner (Givens' secretary) for three months and did nothing, even though she was disclosing criminal investigation information to criminal defendants in jail; revealing personnel action against Turner; and eventual public disclosure about Turner in the newspaper); *Id.*, ¶¶ 103-5 (low-level discipline given to officers who sent racist & inappropriate messages; suspension to the officer who called Ramsay a "tool" in the texts; eventual

public disclosure of same).

70.     The source has provided substantial information that is relevant to this case, which should be subject to discovery:

    a.  That Chief Ramsay maintained a separate off the books system for keeping track of PSB matters that are sensitive or involve upper management, for the purpose of protecting executive staff.  Oldridge Decl., ¶¶ 91-95.

    b.  There is evidence of Chet Pinkston lying in a matter regarding Wendell Nicholson and that some of the lies are captured on recording. Oldridge Decl., ¶ 101, 109.

    c.  Blake Mumma told the officer who listened to recordings confirming that Mia Turner was disclosing investigation information to criminal defendants, "Maybe you didn't hear what your (sic) heard on the jail call," suggesting that Mumma was carrying out a directive that Mia Turner wasn't going to get in trouble because she was Givens' assistant. Oldridge Decl., ¶ 101.

    d.  Givens prevented PSB from investigating Oldridge's December 2019 complaint about Givens and Ramsay.  Oldridge Decl., ¶¶ 95, 107.

    e.  Wendell Nicholson was denied the opportunity to go to the FBI National Academy because the WSU survey made Ramsay and WPD look bad.  Oldridge Decl., ¶ 84.

    f.  A female officer submitted a sexual harassment complaint and PSB did nothing with it for six months, and then assigned a supervisor involved in the harassment to investigate it.  Oldridge Decl., ¶ 84.

71.     Wanda Givens wrote a letter to Oldridge in January 2021 ordering him to cease and desist from engaging in harassment, including: Oldridge's disclosure of Ramsay's perjury to law enforcement and Oldridge's disclosure to City Council of a racially segregated meeting hosted by

Givens for African American officers in the summer of 2020.   A true and accurate copy of Given's cease and desist letter from January 2021 is attached as Exhibit 33.  Oldridge Decl., ¶ 97.

72.     On February 5, 2021, Oldridge submitted a KORA request regarding the status of the complaint he had made against Chief Ramsay and Deputy Givens on December 9, 2019.  On February 10, 2021, the City stated that the investigation was still open.  Oldridge later discovered through a KORA request I submitted in August 2021, that on February 11, 2021, the day after the previous KORA request, the police department closed the complaint against Chief Ramsay and Deputy Chief Givens.  Oldridge learned that the Citizens Review Board had then requested to review the closed investigation during their April 22, 2021, meeting.  According to publicly available meeting minutes, the Board went into Executive Session during the April 22nd meeting to review the closed case.  After coming out of Executive Session, the Board announced they had suspended the review of the case because it was not closed.  Oldridge Decl., ¶ 108.

73.     Givens and Mumma set up a fake PSB file for the purpose of conducting IT / email searches at the City of Wichita to unmask the individual(s) who forwarded information about a racially segregated meeting to the City Council.  Oldridge Decl., ¶ 97; McGivern Decl., ¶ 4(j).

74.     On March 1, 2019, Deputy Chief Anna Hatter signed a letter sustaining Kelly Mar on an alleged rude conduct violation.  However, Hatter did not sign off as having reviewed the underlying file until March 18, 2019.  The paperwork states that Lem Moore, and not Anna Hatter, made the decision to sustain Kelly Mar. It turns out, Chet Pinkston wrote the letter for Hatter to sign.  McGivern Decl., ¶ 4(i); Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, Resp. to SOF 40, pp. 18-19.

75.     On July 3, 2020, Anna Hatter signed a letter stating she determined that Sergeant Kris Henderson (African American) had knowingly departed from the truth in an internal affairs

investigation.  He knowingly told PSB he did not know that a certain investigation was a human trafficking matter, when three of his subordinates told PSB he was clearly aware of that it was because had referred to the matter as such. The underlying incident involved Henderson's permitting a sixteen-year-old girl to be trafficked from Wichita to Oklahoma.  Within hours of signing the letter sustaining Henderson for lying to PSB, Hatter conducted a brief Loudermill hearing in which she testified that she un-sustained her finding. There is no paperwork demonstrating that her finding was unsustained.  Henderson was promoted to Lieutenant within months of this incident.  McGivern Decl., ¶ 4(k); Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, Resp. to SOF 177-181, pp. 47-48.

76.     In early 2021, Deputy Chief Jose Salcido paid a visit to Kristin Brewer, a WSU employee who interfaces with the WPD.  He raised his voice and yelled at her to the point she was in tears.  In the view of Deputy Chief Jose Salcido, his behavior was a positive demonstration of emotional intelligence.  His misconduct was reported to Gordon Ramsay by Andrea Bannister, a high-level official at WSU.  Though Ramsay testified that Brewer was an important community partner, it never occurred to Gordon Ramsay that Salcido should be investigated or disciplined over his misconduct.  McGivern Decl., ¶ 4(m); Mar v. City of Wichita, Memo in Opp to MSJ, 6:19-CV-01330, Doc. 111, Resp. to SOF 45, p. 21.

77.     On March 22, 2022, the Wichita Eagle reported that, with respect to racist and inappropriate text messages circulated among SWAT team members, the only employee suspended was one person who referred to Chief Ramsay as a "tool."   In the article, Mayor Brandon Whipple   reported that the Council would be meeting with City Manager Bob Layton to discuss the matter.  The article revealed that the Wichita Police Department did not disclose to the District Attorney the contents of the messages and the individuals who sent them, until sometime

in March 2022 about an hour after the Eagle began asking questions about the issue. 'We need answers': Wichita council to question city manager on handling of police texts, Wichita Eagle 3/22/2022 (Ex. 34). McGivern Decl., ¶ 5.

78.     On March 23, 2022, the Wichita Eagle reported that City Manager Bob Layton and former Chief of Police Gordon Ramsay disagree whether Ramsay informed Layton of the racist and inappropriate text messages that talked about shooting people. Layton "guarantees" that Ramsay did not tell him what was in the text message or how the officers were disciplined, and he otherwise has no memory of being informed about them. Ramsay maintains that he did keep Layton in the loop. Former Wichita police chief refutes city manager's claim that he didn't know about messages, Wichita Eagle 3/23/2022 (Ex. 35). McGivern Decl., ¶ 6.

79.     Though Ramsay did not disclose the racist and inappropriate text messages to the District Attorney, he apparently did disclose them in the summer of 2021, to a group of black pastors in Wichita called the God Squad. Former Wichita police chief refutes city manager's claim that he didn't know about messages, Wichita Eagle 3/23/2022 (Ex. 35). McGivern Decl., ¶ 7.

80.     On May 17, 2022, Gordon Ramsay penned an open letter to the City Council and Mayor of Wichita, stating that there is unethical and inappropriate conduct in WPD disciplinary matters due to city administration. Ramsay further alleged in the letter that he has witnessed "past requests for information manipulated, information left out and consultant reports changed to fit the requested narrative." Ramsay urged an independent audit of WPD practices. Ramsay 5/17/2022 letter (Ex. 23). McGivern Decl., ¶ 8.

81.     As a result of the abusive investigation & termination with a sustained finding for serious misconduct, Oldridge's record with Kansas C-Post has been tarnished and this has harmed Oldridge's ability to find a reasonably comparable job in law enforcement. Oldridge used to work

as a pre-employment detective and personally knows how damaging such information is to one's ability to get a job in law enforcement.  Oldridge Decl., ¶ 112.

## **Legal Argument**

**1.   Summary Judgment Standards.**

A plaintiff's right to have a jury decide their dispute is so important that it is protected by the Seventh Amendment to the United States Constitution.  A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. Fed. R. Civ. P. 56(a).  The court shall grant summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Id.*  To grant summary judgment otherwise would be to violate the Constitution.

Credibility determinations are reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact."  Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2726 (3d ed.); *see also State Farm Mut. Auto. Ins. Co. v. Farm Bureau Mut. Ins. Co.*, No. 08-1375-WEB, 2010 WL 2544940, at *10 (D. Kan. June 18, 2010) (denying summary judgment because the court cannot make credibility determinations about the witnesses).

Thus, although the Court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson*

*Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000)[5] (emphasis added).  That is, the Court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from *disinterested* witnesses."  *Reeves*, 530 U.S. 133, 151 (emphasis added).

Fed. R. Civ. P. 56(d) provides: *When Facts Are Unavailable to the Nonmovant*. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

### 2.  Plaintiff Has Stated Viable First Amendment Claims.

#### a.  Garcetti/Pickering Framework

Defendants argue they are entitled to dismissal of Plaintiff's § 1983 claims based upon several factors of the *Garcetti / Pickering* analysis applicable First Amendment claims by a public employee.  Memorandum, p. 19 (Doc. 32).  The Tenth Circuit has described five "steps" in that analysis:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

---

[5]  The standard for summary judgment mirrors the standard for judgment as a matter of law.  *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 150 (2000).

*Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017).  The first three steps involve questions of law for the court but the last two are fact questions.  *Id*, at 1222.[6]

Defendants argue Oldridge has failed to meet step (2), arguing that reporting a crime committed by the Chief of Police is not a matter of public concern; and step (3) the City's interest in operating the police department outweighs any First Amendment protection plaintiff might have. These positions are unpersuasive on their face and even less compelling upon careful examination.

Regarding the public concern question, fortunately for Oldridge, this is not a particularly high threshold.  As Judge Posner noted in his unique style:

> We explained that when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of "public concern," they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from ***wholly personal*** grievances—which whether or not protected by the First Amendment are too remote from its central concerns to justify judicial interference with the employment relation.

*Dishnow v. School Dist. of Rib Lake*, 77 F.3d 194, 198 (7th Cir. 1996) (emphasis added); *see also Deutsch v. Jordan*, 618 F.3d 1093, 1100-01 (10th Cir. 2010) (a former police chief who alleged that he was fired for testifying in support of his defamation lawsuit against a private citizen was engaged in constitutionally protected speech on a matter of public concern; rejecting contention that the lawsuit was a purely personal effort to clear his name of a citizen's allegation that he misappropriated public funds).

### b.   Reporting a Crime is Protected by the First Amendment.

The First Amendment bars retaliation for protected speech.  *Crawford–El v. Britton*, 523

---

[6] Defendants' Memorandum incorrectly describes these steps as "elements" of plaintiff's claims upon which he bears the burden of proof.  This is not true, as the fifth step is an affirmative defense on which Defendants bear the burden of proof.

U.S. 574, 592 (1998).  "[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citation and internal quotation marks omitted).

As noted above, the First Amendment protects the right to petition the government for redress of grievances.  The Supreme Court has recognized that the right to petition the Government for the redress of grievances is "one of 'the most precious of the liberties safeguarded by the Bill of Rights....' " *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967)).

The Tenth Circuit has repeatedly held that reporting a crime to appropriate government officials is protected by the First Amendment as a petition to the government for the redress of grievances.  *E.g., Meyer v. Board of County Com'rs*, 482 F.3d 1232, 1243 (10th Cir. 2007); *Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996) (report of assault protected); *see also Howse v. Atkinson*, 2005 WL 1076527, No. 04–2341 (D. Kan. May 4, 2005) (Judge VanBebber holding reporting a crime to a city is protected).   Further, the report of crime need not go to a police department to be protected, as in the *Seamons* case the student reported the crime to school administration and it was deemed protected. 84 F.3d at 1238.

The Tenth Circuit is not out of step.  Other courts have found that "[t]he filing of a criminal complaint is important to effective law enforcement and certainly a matter of public concern." *Lott v. Andrews Center, et al.,* 259 F. Supp. 2d 564, 571 (E.D. Tex. 2013); See also *Javitz v. County of Luzerne*, 940 F.3d 858, 866 (3rd Cir. 2019) (reporting crime by public-employee coworker was matter of public concern).

It is significant that Lance Oldridge's report involves a public figure – the Wichita Chief

of Police.  "As we have held many times, speech reporting the illicit or improper activities of a government entity or its agents is obviously a matter of great public import." *Casey v. West Las Vegas Ind.  School Dist*., 473 F.3d 1323, 1331 (10th Cir. 2007).

*The law regarding the First Amendment protection of a report of a crime by law enforcement is clearly established*. The clarity of the law on this subject is illustrated by a recent decision by Judge Crouse in *Johnson v. Unified School District 507, Haskell County KS*, ___ F. Supp. 3d ___, 2022 WL 184325 (D. Kan. 2022). Judge Crouse had no difficulty concluding that "[g]enerally, the pursuit of criminal charges or allegations of serious misconduct are matters of public interest and concern."   Id, *7.  As support, Judge Crouse cited to Supreme Court authority: -- *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) -- which held "[C]ommission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, ... are without question events of legitimate concern to the public ..." *Id*.  This law is quite established.

Defendants were on notice that Oldridge's complaint was of illegal false testimony by the Chief of Police.  The Tenth Circuit has held for decades that reprisal for protected speech is prohibited:

> It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). Mr. Walter alleges he was discharged because he reported criminal activities of the Chief of Police. If he was discharged in retaliation for his report, this would constitute a violation of a clearly established constitutional right.

*Walter v. Morton*, 33 F.3d 1240, 1243 (10th Cir. 1994).

In the *Walter* case, the plaintiff had reported illegal activities of the police chief to both the district attorney <u>and</u> the Oklahoma Bureau of Investigation. *Id.*, 33 F.3d at 1241.  He was protected from retaliation.  *See also Wulf v. City of Wichita,* where the City of Wichita retaliated against a police officer for, he and his wife's sequential reports of WPD misconduct to multiple outside

agencies.  *Wulf v. City of Wichita*, 883 F.2d 842, 849 (10th Cir. 1989).  In sum, the defendants' argument abouts qualified immunity fails.  It was clearly established that Oldridge was protected in reporting Ramsay's perjury to multiple agencies, in good faith (of course qualified immunity doesn't protect the City defendant in the first place).

     **c.**  **<u>Oldridge's Reports of False Sworn Testimony by the Chief of Police is Protected by the First Amendment, and They Were Not Part of Oldridge's Job Duties.</u>**

In relation to the third step in the *Pinkston/Garcetti* analysis, Defendants argue that "[t]he speech at issue concerned ***only*** a matter of personal interest to Plaintiff who disagreed with Ramsay's assessment (as Police Chief) of Plaintiff's PSB work performance." Memorandum, p. 20 (Doc. 32) (emphasis added).  This is not true.  Oldridge's primary complaint was that the Chief lied under oath.  Part of Oldridge's proof of that lie was the Chief's public statement that PSB officers (including Oldridge) violated no WPD policy.  That is very hard to square with the Chief's deposition testimony that they (1) asked officers who were under investigation leading questions to suggest testimony that would be helpful to the officer; (2) were biased in favor of officers, and (3) were "contaminating" the underlying criminal investigations.  Oldridge intends to depose Ramsay about how doing such things would not violate WPD policy.  This conflict between Ramsay's sworn deposition testimony and his public statement is at the heart of Oldridge's complaint to the DA and Sheriff.  If Oldridge's only concern was with his personal image, the Chief's public statement that he and other officers did nothing wrong would have been seen by Oldridge as a welcome end of the matter.

Given the discussion above about the First Amendment protection to those who report a possible crime, Oldridge's complaints to the DA and Sheriff are not "only" personal but also involve a matter of public concern and are protected by the First Amendment.  The citizens of the

City of Wichita have an interest in ensuring that the Police Chief, who sets the example for all officers, is honest and would not lie under oath. The integrity of law enforcement, particularly the honesty of officers testifying under oath, is not a matter of "wholly personal" concern to Oldridge. Society has made perjury a crime, in part, to protect the integrity of the judicial system. Indeed, ensuring the honesty and integrity of police officers is so important that the Supreme Court requires prosecutors to affirmatively inform criminal defendants of dishonest conduct by any officer involved in a particular prosecution. *Giglio v. United States*, 405 U.S. 150 (1972).

Oldridge will testify that his primary motivation was that the Chief of Police be held accountable for providing false testimony, because the highest-ranking officer of the City must be a truthful person to set a good example for all officers. Defendants may be able to convince a jury that Oldridge was also motivated by personal interests, given that the false testimony did defame him, but there can be no doubt that Oldridge's complaints involved a matter of public concern.

As noted in the quote of Judge Posner above, Plaintiff need not disprove any personal interest – a mixture of personal motive and public-concern motivation is allowed. Judge VanBebber noted this point in denying summary judgment to defendants in a First Amendment case: "Based on Plaintiff's allegations, which the court must accept as true, it appears that Plaintiff had a mixed motive to pursue charges against Chris Barone-one motivated by personal interest as a victim, one motivated by legitimate concerns for the public's safety." *Howse v. Atkinson*, 2005 WL 1076527, No. 04–2341, *7 (D. Kan. May 4, 2005). Indeed, defendants seem to acknowledge this point in claiming that Oldridge's complaint was "only" personal. But that position is implausible.

It appears that Defendants are also arguing that they did not believe Oldridge's complaints to law enforcement were genuine or in good faith. As they put it in their brief:

Plaintiff Lance Oldridge will likely try to characterize his secret communications with the D.A. and Sheriff as the reporting of a crime (i.e., perjury or criminal libel) committed by Ramsay. However, the D.A. totally rejected such a characterization by explaining to Plaintiff that Ramsay's subjective opinions and perception regarding Plaintiff's work performance could not rise to the level of a crime. As a law enforcement officer trained in criminal matters, Plaintiff should have already known that.

Defs.' Brief, p. 21 (Doc. 32). Defendants also describe Oldridge's allegation as "false on its face" and state that Bennett told Oldridge so. (Memorandum, Doc. 32, p. 22). Bennett did *not* rule out Oldridge's allegations on their face. He interviewed Ramsay and he read the entire deposition transcript.

Defendants' "opinions cannot be false" and bad faith arguments miss their mark for several reasons. First, Oldridge's primary allegation was that the Chief of Police lied under oath about whether he actually had previously held the views as he claimed he had in the deposition. Oldridge did not claim Ramsay's actually having such views would be a crime. Second, whether Ramsay ever genuinely held the views expressed during his deposition testimony is a question of historical fact, like any other fact question. If he did not, then he lied. That is a fact issue, not a matter of opinion.[7] Third, at this stage – summary judgment – all fact questions must be resolved in favor of plaintiff. Whether Ramsay lied, and whether plaintiff's report was made in good faith, both will require a jury to resolve issues of intent from circumstantial evidence. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272 (2016) (the motive for Defendants' actions is the key factual in

---

[7] This kind of fact question is not novel. For example, the "honest belief defense" can be overcome by demonstrating that the employer didn't honestly hold its stated belief. *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). A reasonable person reading Ramsay's testimony, his clarifying media release, and Oldridge's declaration, could conclude Ramsay did not hold those opinions at the relevant time. Further, Defendants' own position that Oldridge did not honestly believe his own report, itself, is an example of a fact question relating to whether an opinion was honestly held.

a First Amendment retaliation case).   Fourth, Defendants cite no case stating that plaintiff must prove his complaints were true and were made in good faith as an element of his case.[8]

Defendants make much of the fact that no prosecution resulted from Oldridge's report.  But the right relates to the petition of the grievance, not the outcome.  As Judge VanBebber has noted: "While Plaintiff did not have a right to force the local prosecutor to pursue her charges, she possessed the right to access judicial procedures for redress of her claimed wrongs and to 'set in motion the governmental machinery.' *Howse v. Atkinson*, 2005 WL 1076527, No. 04–2341 (D. Kan. May 4, 2005) (VanBebber, J.).  Further, in a similar First Amendment case brought against the City of Wichita, the Tenth Circuit rejected the City's argument that the employee's complaints weren't protected as "false and malicious" when the employee had a factual basis for his complaints, even though no criminal prosecution resulted.  *Wulf v. City of Wichita*, 883 F.2d 842, 859 (10th Cir. 1989).

Defendants compare the present facts to *Koch v. City of Hutchinson,* 847 F.2d 1436 (10th Cir. 1988).  (Doc. 32, pp. 20-21).  But *Koch* involved a fire investigator who was terminated after he wrote a fire investigation report as a part of his official duties. In finding the speech not protected, the court emphasized that "the fact that his speech took place in a report in the course of his official duties [is] a factor which weighs against, in the circumstances of this case, a finding tht his speech involved matters of public concern for the purposes of the First Amendment." *Id.,*

---

[8] Defendant may raise as an affirmative defense that the complaint was reckless or deliberately false, but that is a defense the defendant must prove.  *Cf, Gertz v. Robert Welsh*, Inc., 418 U.S. 323, 341 (1974) (party challenging otherwise protected speech as being recklessly false bears the burden); Further, this is a classic fact question. *Finley v. City of Colby, Kansa*s, No. 17-1215-EFM, 2020 WL 1547821, at *4 (D. Kan. Apr. 1, 2020)*, appeal dismissed sub nom. Finley v. Alexander*, No. 20-3081, 2020 WL 6336312 (10th Cir. July 2, 2020) ("In this case, although a review of the dash cam video does not appear to support Plaintiff's statements to Alexander, the Court cannot conclude whether Plaintiff deliberately or recklessly made the false statement. Instead, this question is one for the jury to determine. Thus, there is a question of fact inappropriate for resolution on summary judgment as to whether Plaintiff knowingly or deliberately made a false statement of law.")

at 1447.  This easily distinguished *Koch* from the present case, as Oldridge's communications with the D.A. and Sheriff were not done through any report "in the course of his official duties."

The Tenth Circuit has relied on this distinction in *Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008), finding an employee's reporting of a crime related to his job to be protected speech.  The plaintiff in *Thomas* was a city building inspector. 548 F.3d at 1319. While doing his job, he saw a completed certificate of occupancy for the Mayor's house even though he had not performed a final inspection of the house. *Id.* Thomas reported the fraudulent conduct to the Oklahoma Bureau of Investigation and was later fired.  *Id.*  The defendant city raised many of the same defenses raised by Defendants here and the district court granted summary judgment. 548 F.3d at 1322. Finding that "Thomas' speech was constitutionally protected," the Tenth Circuit reversed. 548 F.3d at 1329.  The Court rejected the "official duties" argument:

> The question under *Garcetti* is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. *See id.* at 421. Merely because an employee's speech was related to their work does not necessarily remove that employee's speech from the ambit of constitutional protection. *See Brammer–Hoelter*, 492 F.3d at 1204. Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was "commissioned" by the employer. *Garcetti*, 547 U.S. at 421–22.

548 F.3d 1317. After noting that the Tenth Circuit's case law after *Garcetti* had taken a "broad" view of speech made pursuant to one's job duties, the Tenth Circuit explained that "[on] the other hand, it would be going too far to hold that every time a public employee discovers alleged wrongdoing related to his job . . . the speech is unprotected." *Id.,* at 1324.  In finding Thomas' speech to be protected, the Court noted that "[n]o one could say he was 'commissioned' by the City to report suspected wrongdoing to the OSBI."  *Id.*  The fact that the crime of creating a fraudulent certificate of occupancy was related to Thomas' job as a housing inspection did not preclude First Amendment protection.  The Tenth Circuit's reasoning in *Thomas* leads to the same

conclusion here. Nobody would argue that Lance Oldridge was "commissioned" by the WPD to report crimes committed by the Chief to outside agencies.

Another indicator that Oldridge engaged in protected activity is that he went outside his chain of command in reporting Ramsay's perjury. *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1136 (10th Cir. 2010); *Considine v. Bd. of Cnty. Comm'rs of Cnty. of Adams, State of Colo.*, 910 F.2d 695, 700 (10th Cir. 1990).  For example, in *Wulf v. City of Wichita*, a lieutenant in the defendant city's police force was fired by the defendant chief of police after the lieutenant prepared and sent a letter to the Kansas attorney general and also showed it to the DA's office, requesting an investigation of certain activities and incidents within the police department. 883 F.2d at 852–53, *cited in Considine*, 910 F.2d 695, 700. The Wichita Police Chief did not receive qualified immunity in *Wulf.*

### d.  <u>Oldridge inquiring of Public Officials about Pandemic Risk is Protected, and It Was Clearly Established that Such Speech is Protected</u>.

Exhibit 22 is an email sent by Lance Oldridge in 2014 as a private citizen to the City Council, about whether appropriate precautions were being taken with respect to a City delegation to Africa during the Ebola outbreak.  Public safety is usually always a matter of public concern. *See*, *e.g.*, *Lee v. Nicholl*, 197 F.3d 1291, 1294 (10th Cir. 1999) (unsafe traffic safety and snow removal; denying qualified immunity); *Conaway v. Smith*, 853 F.2d 789, 795 (10th Cir.1988) (holding an employee memo notifying the county of substandard electrical work was protected by the First Amendment in part because it alleged a threat to public health and safety); *Considine v. Bd. of Cnty. Comm'rs of Cnty. of Adams, State of Colo.*, 910 F.2d 695, 702 (10th Cir. 1990) (speech alleging "public health, safety and welfare" violations at various county project sites constituted speech on matter of public concern); *Johnsen v. Independent School District No. 3*, 891 F.2d 1485,

1490 (10th Cir.1989) (school nurse's speech about employer's medication policy was a matter of public concern in part because of its potential impact on the health and safety of school children).

Wanda Givens, who later became a Deputy Chief, was very upset by that email, believing it to be racist. She has brought that email up years later as having been racist. Wanda Givens was the person who reported Lance Oldridge to Professional Standards Bureau after Lance Oldridge reported the Chief's testimony to Mark Bennett and Sheriff Easter. Plaintiff alleges that one reason Givens was motivated to report Oldridge was the Ebola email. Defendants' Memorandum simply ignores this component of Oldridge's First Amendment claim.

Lance Oldridge's email to Jeff Longwell about Ebola risk involves a matter of public concern and is protected by the First Amendment. If we learned anything during the period of Covid19, it is that a virus can pose a real risk to society in general, not just isolated individuals. Defendants' Motion ignores that the First Amended Complaint also addresses other speech.

### e. Avoiding Investigation of the Police Chief for a Crime of Dishonesty Is Not Necessary for the Efficient Operation of the Department.

Defendants argue that efficiency concerns preclude Oldridge's speech from having First Amendment protection under the third step of *Pickering/Garcetti*. This type of argument was rejected by the Tenth Circuit in *Thomas v. City of Blanchard.* As the Tenth Circuit put it:

> For purposes of the third prong [of *Garcetti/Pickering*], the question is not whether the plaintiff's speech was accompanied by disruptive behavior or made in a disruptive manner, but whether the government's legitimate interests provide a sufficient justification for controlling the plaintiff's message. As we explained in *Cragg v. Osawatomie,* 143 F.3d 1343, 1346 (10th Cir. 1998), the *Pickering* analysis "requires us to ask whether [the employer] has an efficiency interest which would justify it *in restricting the particular speech at issue.*" (Emphasis added). The defendants make no argument relevant to that inquiry.

*Thomas*, 548 F.3d 1317, 1327 (10th Cir. 2008). Thus, the reaction by other employees is irrelevant. The correct question is whether Defendant has an interest in preventing the reporting of a crime of dishonesty by the Police Chief. It is hard to imagine what possible interest Defendant would have

in that.  Judge Crouse recently relied on *Thomas* in rejecting a similar "efficiency" argument in

*Johnson*, finding:

> in balancing the interests of efficient public service and individual free speech, courts give greater weight to speech about matters of public concern. *See Lane*, 573 U.S. at 241; *Thomas v. City of Blanchard*, 548 F.3d 1317, 1327 (10th Cir. 2008). The Johnsons' conduct involved a matter of public concern, not an internal grievance. … Moreover, the School District fails to identify any legitimate interest that its actions would advance.

*Johnson v. Unified School District 507, Haskell County KS*, __ F. Supp. 3d ___ 2022 WL 184325,

*7 (D. Kan. 2022).  In *Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996), the Court rejected

a school district's argument that a student's report of hazing to administrators, coaches, and

families was disruptive: "At most, the school's interest here was based on its fear of a disturbance

stemming from the disapproval associated with Brian's unpopular viewpoint regarding hazing in

the school's locker rooms. Under *Tinker*, that is not a sufficient justification to punish Brian's

speech in these circumstances."

This efficiency argument is very fact specific.  Plaintiff has not been allowed to conduct

discovery on claims that his complaints had a negative impact on efficiency.  Plaintiff intends to

depose former Chief Ramsay, and others, about this issue.  It would be inappropriate to grant

summary judgment on this basis without plaintiff having had no ability to conduct such discovery.

### f.   Oldridge's Protected Speech Was a Motivating Factor in Defendants' Decision to Suspend, Subject to an Abusive Investigation, and Terminate Oldridge.

The fourth element of *Garcetti / Pickering* asks whether the speech was a motivating factor

in the adverse employment action.  *Roberts v. Winder*, 16 F.4th 1367, 1381 (10th Cir. 2021).  When

evaluating whether the speech was a motivating factor in the government employer's actions,

"temporal proximity between the speech and the challenged action," and "evidence the employer

expressed opposition to the employee's speech" are relevant. *Roberts*, 16 F.4th 1367, at 1382 (citations omitted).

Here, there is evidence of temporal proximity: the investigation commenced within a couple weeks of Ramsay revealing to his deputy chiefs that Oldridge had complained to the DA and the Sheriff. The investigation opening letter listed 18 witnesses who had nothing to do with Oldridge's reports about Ramsay. When Oldridge immediately demonstrated that he had properly disclosed to the Sheriff what the DA had reported to Oldridge, the City came up with other reasons to investigate him.

Further, there is evidence of disproportionate hostility by WPD against anyone who makes Gordon Ramsay look bad (not only in the case of Lance Oldridge). In the recent texting scandal, for example, the only person who was suspended is the person who called Ramsay a "tool." Deputy Chiefs conducted forensic searches to find out who made negative comments about the WPD in an anonymous survey. PSB set up a fake file to conduct forensic searches and find out who disclosed to the public a racially segregated meeting hosted by Wanda Givens and personally approved by Gordon Ramsay. Mumma allegedly told the person who overheard Mia Turner (Givens' secretary) sharing confidential law enforcement information with a criminal suspect that maybe he didn't hear what he heard. In May of 2019, Rick Craig's allegations about Oldridge weren't credible (when he tried to offer information to Mumma to seek lenience in his own PSB matter), but they became credible in Mumma's eyes in December 2019, when he listed Craig as a witness in PSB's investigation of Oldridge. Whatever the original purpose of PSB was, it has become a weapon of management, and the Court cannot bless or rely on its assertions.

PSB commander Doug Nolte, said it best on October 21, 2016, when he told Lance Oldridge: "my observation is that you are fair, you're honest, you're thorough, and those are things that are putting a mark on you." Oldridge Decl. ¶ 9 (quoting recording).

*Each of the Defendants are liable to Oldridge for First Amendment violations*.   Under Section 1983, a government actor is liable if he "set in motion a series of events" that he knew or reasonably should have known would cause others to deprive plaintiff of his constitutional rights. *McIntyre v. Unified Government of Wyandotte County*, No. CV 18-2545-KHV, 2022 WL 2337735, at *5 (D. Kan. June 28, 2022), *citing Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (citations omitted); *see also Russell v. May*, 306 Kan. 1058, 1078, 400 P.3d 647, 662 (2017) (if first actor could reasonably foresee intervening cause, his negligence may be considered proximate cause, notwithstanding intervening cause).

In other words, a defendant is liable for the harm that his conduct proximately causes. *McIntyre*, 2022 WL 233735, *5, *citing Martinez*, 697 F.3d at 1255.   Accordingly, an officer can be liable for the violation of plaintiff's constitutional rights if the violation would not have occurred but for defendant's conduct and if no unforeseeable intervening acts superseded defendant's liability. *Id*. The fact that people other than defendant "may have concurrently caused the harm does not change the outcome as to [defendant]." *Id*. (citations omitted).  Causation generally is a question of fact for the jury.  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013), *cited in McIntyre*, 2022 WL 233735, *5.

The PSB investigation of Oldridge itself, being in retaliation, triggers liability under the First Amendment.  Because the First Amendment protects speech, any action that may reasonably be expected to chill protected speech is sufficient to trigger protection.  Thus, First Amendment retaliation claims do not depend on a property interest in continued employment. *See Mt. Healthy*

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977).  Termination is not required. The Supreme Court has held that "promotions, transfers, and recalls after layoffs" in retaliation for exercise of First Amendment rights trigger liability.  *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75 (1990). The Tenth Circuit has held that "[a]ctions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment" and that "substantial harassment and abuse" is sufficient.  *Morfin v. Albuquerque Pub. Schs.*, 906 F.2d 1434, 1437 n. 3 (10th Cir. 1990). Indeed, the Tenth Circuit has also held that First Amendment retaliation claims can be based on removing job duties from an employee's portfolio or giving an employee a written reprimand or a poor performance rating. *Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999).  Thus, First Amendment retaliation claim may be based on "repercussions that would not be actionable under Title VII."  *Baca v. Sklar*, 398 F.3d 1210, 1220– 21 (10th Cir. 2005).  Given that even Title VII can be triggered by "a lengthy, unfair, and damaging investigation" (*Owens v. Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, No. CV 21-2185- KHV, 2022 WL 2131117, at *8 (D. Kan. June 14, 2022), certainly the investigation here – which included interviewing 18 people who knew nothing of Oldridge's reports to the DA and Sheriff -- is sufficient to meet the more liberal standard under the First Amendment.

The limited summary-judgment record establishes the following bases for liability against the Defendants:

> (1)    Defendant Ramsay disseminated information about Oldridge's complaints to his Deputy Chiefs so that they could investigate Oldridge for F-level (termination) violations.  According to Deputy Chief Salcido, Chief Ramsay "yielded" and let Givens initiate an investigation of Oldridge (Doc. 32-12).  Ramsay's "yielding" to his subordinates' request to retaliate against Oldridge makes him liable under § 1983 both as

a supervisor and a conspirator. *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) ("In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution. Then, a plaintiff must show an "affirmative link" between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates.")

(2)     Defendants Hatter, Givens, and Salcido got together and decided to initiate an investigation of Oldridge over his complaints to the DA and the Sheriff.  This subjects them to liability under § 1983 individually, and as conspirators. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (to prove a § 1983 conspiracy, plaintiff "must prove both the existence of a conspiracy and the deprivation of a constitutional right"); *see also Douglass v. Garden City Cmty. Coll.,* 543 F. Supp. 3d 1043, 1060 (D. Kan. 2021).

(3)     Givens executed a document, based upon her discussions with Salcido and Hatter, demanding a PSB investigation of Oldridge because he complained about Ramsay's false testimony to the DA and the Sheriff.  Not only was Givens motivated by Oldridge's reports of Ramsay's perjury (e.g., cease and desist letter from Givens that refers to Oldridge's reports of Ramsay's perjury and the segregated meeting as "harassment") but also Oldridge's 2014 email to the City Council about the Ebola issue and Sarah Oldridge's complaints about Wendell Nicholson's qualifications and Oldridge's resulting lawsuit.

(4)     Salcido authored a memorandum on December 4, 2019, prejudging that Oldridge's complaint to the Sheriff and falsely stating that Oldridge hadn't disclosed to the Sheriff what the DA had told him.

(5)     Blake Mumma, at the behest of Hatter, Givens, and Salcido, prepared a notice of investigation that claimed Oldridge engaged in F-level misconduct by filing complaints about criminal conduct with the DA and the Sheriff, without informing the Sheriff that the DA had already made a "finding."  He included eighteen witnesses in the initial notice of investigation of Oldridge that had nothing to do with Chief Ramsay's false testimony.  Mumma was clearly embarking on a fishing expedition.

(6)     As soon as Oldridge disproved the basis for the investigation, Mumma said it wasn't up to him, but someone above him, to decide whether to continue with the investigation.  He ultimately prepared a revised notice of investigation to cover different alleged violations from Oldridge's reports to law enforcement.  Mumma was supervised by Hatter throughout this process and was therefore part of the § 1983 conspiracy, in addition to individually violating Oldridge's rights by commencing and pursuing an investigation of Oldridge for reporting Ramsay's perjury to outside agencies.  Though the record is limited as there has been no discovery, Oldridge has proffered evidence that Givens, Pinkston, and Mumma abused the PSB process, by either targeting people or deliberately failing to investigate police misconduct. Further, Mumma bore hostility towards Sarah Oldridge's email questioning Wendell Nicholson's qualifications for Captain and her resulting lawsuit.

(7)     The City, through its policymaking agent Bob Layton, embraced and approved the unlawful termination of Oldridge.  The City Manager's decision and his refusal to reinstate Oldridge expressly reference and rely on Oldridge's report of Ramsay's perjury to law enforcement.  The letter refusing to reinstate Oldridge expressly relies on

the perjured testimony of Jeremy Vogel.  Layton is individually liable for his unlawful

conduct and for conspiring with his WPD management to retaliate against Oldridge.

### g.  __Defendants bear the burden of proof as to their same-decision defense and aren't entitled to summary judgment on that basis.__

Defendants claim that the fifth element of *Garcetti / Pickering* – "whether the defendant

would have reached the same employment decision in the absence of the protected conduct" – is

something plaintiff must prove.  They cite *Helget v. City of Hays*, 844 F.3d 1216, 1225 (10th Cir.

2017) for this, but that case did not event involve the fifth element – same decision defense.  There

can be no question that this element is actually a defense regarding which the defendant has the

burden of proof:

> And, perhaps most importantly, at the fifth step, the burden remains with the defendant. Walton, 821 F.3d at 1211 ("[A] defendant seeking to prevail at summary judgment must show a reasonable factfinder ... would have to ... accept its affirmative defense."). "Unlike in the McDonnell Douglas burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." Dye, 702 F.3d at 295.

*Roberts v. Winder*, 16 F.4th 1367, 1381-84 (10th Cir. 2021).

Defendant cannot establish its affirmative defense because, at bottom, Mumma was

ordered to continue with an investigation of Oldridge after Oldridge promptly demonstrated the

basis for the investigation was false.  Moreover, the limited summary-judgment record establishes

that Defendants, as a group or separate, all lack credibility.  Layton's decision expressly relies on

the testimony of Jeremy Vogel to sustain Oldridge's termination: that Vogel "tried to do a lot of

coaching and mentoring" so he would not reach the point of formal discipline with Oldridge.

When asked, "Did you write down or make notes about your discussions with Mr. Oldridge?",

Vogel responded: "No, I didn't because it was too numerous, and if I did over the course of the

time that I had supervised him, it would be like a thick novel." But when he was initially interviewed by PSB, Vogel reported that he had never coached or mentored Oldridge and did not see any issues. Chet Pinkston, the Deputy Chief on whom Ramsay relied for advice with discipline matters, thinks Vogel's testimony is great because it helped the City's cause. Oldridge Decl., ¶ 79-82. There is other evidence establishing that PSB is more of a management weapon than it is a factfinding bureau. Recently, Defendant Ramsay has publicly challenged the credibility of officer discipline and investigations at WPD.

It is the rare case where the party with the burden of proof is entitled to judgment as a matter of law. This is why plaintiffs almost never file for summary judgment. The reason is that the finder of fact is always free to disregard evidence based on credibility or other grounds that may call it into question. This Court recently emphasized this point when it reversed a District Court that had granted summary judgment to a defendant on an affirmative defense:

> "Summary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Significantly for the instant case, "where the moving party has the burden [of proof]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting Schwartzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487–88 (1984)) (emphasis in original*). See also Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original) [multiple citations omitted]. ***In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment."*** 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015).

*Leone v. Owsley*, 810 F.3d 1149, 1153–54 (10th Cir. 2015) (reversing summary judgment on the defendant's affirmative defense) (emphasis added). Because a reasonable factfinder could

disbelieve the Defendants' claimed reason for termination as being independent from his protected First Amendment communications, summary judgment is not appropriate.

Finally, this "same decision" defense is inherently factual. Yet plaintiff has not been allowed to conduct discovery to determine whether there are additional reasons for a jury not to believe it. Plaintiff should be given the opportunity to conduct such discovery. This will include deposing former Chief Ramsay on the subject, as well as looking into comparator evidence. There is good reason to believe plaintiff will succeed in finding strong comparator evidence. For example, Jeremy Vogel changed his testimony in this case but it does not appear he was disciplined. Yet when Lance Oldridge modified his PSB testimony the very next day, without provocation, to clarify something he said, he was accused of providing false testimony and this was relied upon to terminate him.

### 3. The City of Wichita's Arguments Regarding Title VII Miss the Mark Because They Fail to Read the Amended Complaint as a Whole.

Defendant's only challenge to Oldridge's Title VII (and presumably KAAD) claims is that the Amended Complaint fails to adequately plead them under the "pleading standards set forth in *Twombly* and *Iqbal*." (Doc.32, p. 30). Defendants' Memorandum states the Amended Complaint fails to state a claim under Title VII because it "merely identifies the purported illegal factor (race) upon which he is relying for his discrimination claims with no supporting factual allegations." (Doc.32, p. 30). That simply is not true.

Rule 8 requires a "short and plain statement" of facts establishing an entitlement to relief. Even post-*Twombly*, federal pleading requires plaintiffs to set forth only their "claims for relief, not causes of action, statutes or legal theories." *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir.2008); *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) (plaintiffs "need not use particular words to plead in the alternative," only "a formulation from which it can be reasonably inferred that this is

what they were doing"). *cf. Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era").

In determining whether a Title VII disparate treatment claim is plausibly alleged, the Court doesn't require plaintiffs to establish a prima facie case. Instead, the issue is whether the Plaintiff has set forth a plausible claim in light of the elements of their claim. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050–51 (10th Cir. 2020). To set forth a prima facie case of discrimination, a plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he is qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Concerning retaliation:

To establish a prima facie claim for retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) a reasonable person would have found her employer's subsequent action to be materially adverse; and (3) a causal connection exists between her protected activity and the employer's action. McGowan v. City of Eufala, 472 F.3d 736, 741 (10th Cir.2006). As to the critical second step here, an employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006). This standard focuses on the employer's retaliatory action, not the underlying discrimination the employee had opposed. Id. at 69–70. And while the standard is sensitive to the particular circumstances of each case, id. at 69, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings about those circumstances, id. at 68. Each case is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 7 (quotations omitted).

*Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).

The City's balkinzation argument—that Plaintiff has failed to link up his termination with those who might be motivated to discriminate or retaliate—misses the point. Courts draw on their own "experience and common sense" in deciding whether the Complaint satisfies the plausibility

requirement of Rule 8.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  When viewed in the light most favorable to the Plaintiff, the Amended Complaint leaves little doubt as to what happened, why it happened, and how it was wrong and illegal.  It doesn't take much sense either.

The Amended Complaint contains many factual allegations which, read together, state a claim of race discrimination.  Lance Oldridge is a Caucasian male.  (Doc. 18, Amended Complaint, ¶ 2).  Deputy Chief Wanda Givens is African-American.  (¶ 7.)  Wanda Givens is the person who reported Lance Oldridge to Professional Standards Bureau for his protected statements to the DA and Sheriff.  (¶ 59).  She has long accused Lance Oldridge of being racist because of his Ebola email.  (¶¶ 20, 21).  Oldridge specifically alleged that his "race played a role in the suspension, investigation, and termination." (¶ 95).  Consider, if Oldridge and his spouse were African American, Givens wouldn't have considered their legitimate concerns to be acts of racism.  *See* Bostock v. *Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1742 (2020) (stating that the inquiry under status-based discrimination claims arising under Title VII, the question is whether the protected characteristic made a difference, even if other factors did as well).

Moreover, the City of Wichita – particularly its police department -- is the peculiar employer that would have reason to discriminate against the majority.  Policing agencies are rightly concerned with their public image within the African American community.  Developing a racially balanced police department is no-doubt difficult.  A short-cut for leadership to reach this goal would be to look the other way from wrongful conduct by minorities but hold White officers strictly responsible for similar conduct. A laudable end, however, does not justify every means. The legitimate concern with racial diversity does not justify illegal measures.[9]

---

[9] There are formal procedures that must be followed to adopt and implement a legally defensible affirmative action program. *See* https://www.dol.gov/general/topic/hiring/affirmativeact

Yet the City appears to have taken illegal steps to reach its goals. As noted in Plaintiff's statement of facts, the City held a race segregated meeting in 2020, falsely denied that it occurred, and then conducted a forensic search under a fake PSB file number to find out who disclosed the segregated meeting to City Council. Further, the City knowingly used the perjured testimony of Jeremy Vogel, who is Asian American, to support the decision to refuse to reinstate Lance Oldridge. The City also un-sustained a legitimate finding that Kris Henderson, who is African American, lied to PSB. Wanda Givens, African American, had license to engage in wrongful conduct, carte blanche, without any consequence. In fact, PSB covered up the criminal conduct of Givens' assistant (African American) until after Givens had retired. Captain Wendel Nicholson (African American) included a false statement on his application for promotion to Captain and, when asked about it in the Sara Oldridge lawsuit, the City produced a false version of his application in discovery (only later to try to explain that away as a computer problem). Oldridge incorporates his factual arguments from above as well, from section 2(g) and 2(h). Givens even filed a racial discrimination complaint against Oldridge after he filed a complaint against her for initiating the illegal investigation. The City knows this and therefore is on notice of what Oldridge is claiming in this lawsuit regarding Title VII.

Plaintiff has not had the benefit of discovery in this case, but intends to conduct discovery on all of the above examples. He will also seek to find other similar examples. Summary judgment is thus not appropriate at this stage. Retaliation is established from the pleadings and the evidence provided in opposition to Defendant's Motion, specifically evidence that Mumma, the PSB commander who investigated Oldridge, falsely characterized Sarah Oldridge's email as "ridiculing" Ramsay. He dredged up witnesses that he had deemed lacking credibility to provide information about Oldridge. Management apparently instructed Mumma to continue the witch

hunt even after Oldridge proved that the basis for the investigation was false.  Respectfully, Plaintiff has submitted a prima facie claim of Title VII retaliation.

In addition to the illegal termination, a lengthy, unfair, and damaging investigation can qualify as an adverse employment action under Title VII.  *Owens v. Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, No. 21-cv-02185-KHV, 2022 WL 2131117, at *8 (D. Kan. June 14, 2022).  Of course, Title VII's retaliation standard is broader than an adverse employment action and would certainly encompass the commencement of a bogus investigation <u>after</u> the Plaintiff demonstrated that there was no basis for an investigation.

### 4.  <u>Oldridge has stated a Viable Equal Protection Claim.</u>

As with their challenge to Oldridge's Title VII claim, Defendants' only challenge to his Equal Protection claim is that it is not well pleaded.  This challenge fails for reasons similar to why the challenge to the Title VII claim fails – the Amended Complaint, read in its entirety, provides sufficient facts to state a claim against Wanda Givens, in that she engaged in retaliatory conduct (discussed above) towards Lance Oldridge based upon her hostility towards his wife's protected activities of reporting discrimination and pursuing a lawsuit and EEOC charges.  *Bird v. West Valley City*, 832 F.3d 1188, 1208 (10th Cir. 2016) (evaluating Equal Protection Clause claim the same way as a Title VII claim). The law has been clearly established for over 70 years that government actors cannot discriminate against people on the basis of race.  *See Sturdivant v. Fine*, 22 F.4th 930, 939 (10th Cir. 2022).

WHEREFORE, Plaintiff Lance Oldridge respectfully requests that the Court deny the motion for summary judgment filed by Defendants, or as appropriate, to defer consideration of the motion until after the close of discovery.

Dated: July 6, 2022.

SUBMITTED BY:

GRAYBILL & HAZLEWOOD, LLC

/s/ Sean McGivern
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932
218 N. Mosley St.
Wichita, KS 67202
Telephone: (316) 266-4058
Fax: (316) 462-5566
don@graybillhazlewood.com
sean@graybillhazlewood.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2022, the above and forgoing **Plaintiff's Opposition to Defendant's Motion for Summary Judgment** was electronically filed with the Clerk using the CM/ECF system, which will send notice of electronic filing to the following:

Jennifer M. Hill, #21213
jhill@mcdonaldtinker.com
Edward L. Keeley, #09771
ekeeley@mcdonaldtinker.com
MCDONALD TINKER PA
300 W. Douglas, Ste. 500
Wichita, KS 67202
Phone: (316) 263-5851
Fax: (316) 263-4677
**Attorneys for Defendants**

/s/ Sean McGivern
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932