# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LANCE OLDRIDGE,

      *Plaintiff,*

v.

      Case No. 21-1284-EFM

CITY OF WICHITA, KANSAS, et al.,

      *Defendants.*

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgement filed by Defendants Anna Hatter, Robert Layton, and the City of Wichita (Doc. 199). Plaintiff Lance Oldridge alleges that Defendant Hatter and Layton are liable for retaliating against him under 42 U.S.C. § 1983  by terminating his employment with the Wichita Police Department ("WPD") in violation of the First Amendment. He brings three claims against the City, all based on the City's actions in launching an investigation, suspending him, and terminating his employment. The first action against the City is brought under 42 U.S.C. § 1983 alleging that the City retaliated against him in violation of the First Amendment. He brings two twin claims against the City under Title VII and the Kansas Act Against Discrimination ("KAAD") alleging that the City engaged in unlawful race discrimination and unlawfully retaliated against him. For the reasons stated herein, the Court grants in part and denies in part Defendants' motion.

## I.    Factual and Procedural Background[1]

Plaintiff worked for the Wichita Police Department ("WPD") from 1993 to April 2020, serving as a detective for most of those years. Plaintiff was assigned to the Professional Standards Bureau ("PSB") for several years and was transferred out of that assignment in October 2016. The PSB acts as the internal investigations department of the WPD and reviews whether WPD employees are in violation of the City's policies and regulations. PSB documents and records are maintained by the WPD in a confidential manner.

In 2014, members of the City Council visited Africa. Plaintiff emailed Defendant Layton and members of the City Council expressing concern over the visit and a then-recent Ebola outbreak. Defendant Layton received the email but testified that he does not recall it.

In May 2019, the then-WPD Police Chief Gordon Ramsay was compelled to provide deposition testimony in an excessive force case related to the shooting of a civilian. The parties refer to this case as the *Finch* matter. Chief Ramsay was deposed about a multitude of departmental changes he had made as well as about how the PSB investigated police misconduct. Chief Ramsay testified that one of the changes he made was to move some officers out of the PSB. Plaintiff was one of the officers Chief Ramsay had moved. Chief Ramsay testified that among the reasons he moved officers was that some PSB investigators were using leading questions and that he was concerned about the fairness of the PSB's investigations. Plaintiff disputes the truthfulness of Chief Ramsay's testimony and asserts that he was removed from the PSB because he recorded his supervisor and because of a workplace violence complaint. Chief Ramsay's testimony became an open court record and the local media picked up on the story.

---

[1] Consistent with summary judgment procedure, the facts are uncontroverted unless otherwise noted.

The Wichita Eagle published an article titled "Wichita Chief Concerned About Police Shooting Investigations." The article quoted from Chief Ramsay's deposition and reported that Chief Ramsay spoke poorly of multiple detectives. In response to the news coverage, Chief Ramsay issued a statement to refute the media's characterization of his deposition testimony. In this press release he stated that the officers he removed from the PSB were good officers who did nothing wrong. Plaintiff noted the discrepancy between Chief Ramsay's deposition testimony and press release and concluded that Chief Ramsay lied in his deposition testimony.

In July 2019, under the sincere belief that Chief Ramsay testified falsely at the deposition, Plaintiff emailed the Sedgwick County District Attorney, Marc Bennett ("DA Bennett") and requested DA Bennett open an investigation into Chief Ramsay for criminal false communication. DA Bennett reviewed Plaintiff's request and Chief Ramsay's deposition. He responded to Plaintiff by email in October 2019, communicating that he would not initiate an investigation because Chief Ramsay's deposition testimony was comprised of statements of opinion that could not be criminalized. After communicating this to Plaintiff, DA Bennett advised Chief Ramsay of Plaintiff's request.

Plaintiff also contacted the Department of Justice with his complaint, seeking a federal indictment of Chief Ramsay. The federal authorities did not respond to Plaintiff's request. Shortly thereafter, Plaintiff went to the Sedgwick County Sheriff, Jeff Easter with his complaint against Chief Ramsay. Plaintiff's communications to Sheriff Easter began a series of events that eventually led to Plaintiff's termination.

On November 12, 2019, Plaintiff first contacted Sheriff Easter with his concern that Chief Ramsay may have committed perjury; this first conversation was not recorded or written. A few days later, Plaintiff emailed Sheriff Easter with documents allegedly supporting his claim that

Chief Ramsay committed perjury. Some of the documents were internal WPD documents subject to a confidentiality agreement that Plaintiff had signed. Sheriff Easter contacted Chief Ramsay and DA Bennett about the matter. Ultimately, Sheriff Easter decided not to pursue a charge of perjury against Chief Ramsay. On November 26, 2019, Sheriff Easter wrote a letter to Plaintiff declining to investigate Plaintiff's complaint against Chief Ramsay.

Shortly after Sherrif Easter notified Chief Ramsay of Plaintiff's allegations, Chief Ramsay called WPD Deputy Chief Jose Salcido and alerted him to Plaintiff's complaints. Deputy Chief Salcido met with WPD Deputy Chief Wanda Givens and Deputy Chief/Defendant Hatter to discuss the impact of Plaintiff's actions. Deputy Chief Salcido assumed that Plaintiff did not disclose to Sheriff Easter that DA Bennett had already reviewed Plaintiff's complaint and surmised that Plaintiff was not fully truthful in his communications. These three Deputy Chiefs decided an investigation was necessary to determine if Plaintiff had departed from the truth by withholding information from Sheriff Easter. They met with Chief Ramsay, requested that the PSB investigate the matter, and requested that Chief Ramsay remove himself from the investigation. Chief Ramsay acquiesced to their requests, removing himself from the investigation and as a decision-maker regarding any disciplinary action. Plaintiff disputes that Chief Ramsay was in fact removed from the process. Rather, he asserts that Chief Ramsay continued to exercise oversight over the process through his Executive Officer, Captain Chester Pinkston.

The three Deputy Chiefs decided that Deputy Chief/Defendant Hatter was not to be involved in the investigation but would serve as the deciding official for any disciplinary action resulting from the investigation. Plaintiff disputes that Deputy Chief/Defendant Hatter was not involved in the investigation but rather maintains that she interviewed an FBI agent during the

investigation. Further he alleges that Captain Pinkston authored and advised Deputy Chief/Defendant Hatter in the disciplinary decisions.

The parties dispute when the investigation began, but Plaintiff was served with the notice of investigation on December 6, 2019. Deputy Chief Givens, who is identified as the investigation's "complainant," served Plaintiff with the notice. Plaintiff was suspended pending the investigation. The documented basis of the complaint was "[e]ven though [Plaintiff] received DA Bennet's finding prior to contacting Sheriff Easter, he still presented the incident as criminal and did not inform Sheriff Easter of DA Bennett's previous review and ruling." The initial notice of investigation listed 21 witnesses. Plaintiff asserts that only two witnesses had knowledge of the facts related to the initial charge of dishonesty—Sheriff Easter and DA Bennett.

PSB Lieutenant ("LT") Blake Mumma was assigned to conduct the investigation into the allegation that Plaintiff departed from the truth. On December 9, 2019 (before the investigation began according to Defendants), Plaintiff, through a Fraternal Order of Police ("FOP") representative, provided LT Mumma with a packet of information demonstrating that Plaintiff told Sheriff Easter of his communications with DA Bennett on at least November 19, 2019.[2] Also on December 9, 2019, Plaintiff filed an internal complaint alleging that Deputy Chief Givens and Chief Ramsay were retaliating against him because his wife, Sarah Oldridge (who was also a WPD officer), had filed a discrimination claim against the City.

Included in the packet of information provided by Plaintiff's FOP representative were several emails from Plaintiff to Sheriff Easter. Portions of these emails and the attachments were blacked out with marker. The redacted portions of the emails were later discovered to include

---

[2] Plaintiff maintains that he told Sheriff Easter about DA Bennett's decision not to pursue an investigation into Chief Ramsay on November 12, 2019.

confidential documents. When LT Mumma saw the redacted language, he began to investigate what Plaintiff was "trying to hide." In response to receiving these documents and in coordination with the FOP, the notice of investigation was amended to omit the initial charge in the investigation. Plaintiff asserts that after he provided information clearing him of the initial charge, the investigation should have ended. However, a charge that Plaintiff had "no regard for his obligations as an officer" was added. The parties dispute the timing of when this additional charge was added.

As part of the investigation, LT Mumma investigated disparaging comments Plaintiff had made toward Chief Ramsay. These comments were made in the Training Academy, which is where Plaintiff was assigned to work after he was transferred out of the PSB. After months of investigating these matters, LT Mumma wrote a lengthy report of investigation.

Deputy Chief/Defendant Hatter reviewed the report and found that Plaintiff had committed seven violations of WPD policy, four of which were offenses that rose to the level of possible termination. Plaintiff was notified of Deputy Chief/Defendant Hatter's findings and afforded an opportunity to respond at a due process hearing. After the due process hearing held on March 25, 2020, Deputy Chief/Defendant Hatter revised her findings. She removed one policy violation and amended two others. Ultimately, in a letter dated March 30, 2020, Deputy Chief/Defendant Hatter recommended Plaintiff's employment be terminated. Specifically, she recommended Plaintiff's termination because he had shared prohibited documents (the documents he provided to Sheriff Easter), had not cooperated with the investigation (redacting the documents provided to LT Mumma and related statements to LT Mumma about the redactions), and had little regard for his duties (making disparaging comments made about Chief Ramsay in the Training Center). Plaintiff disputes that Deputy Chief/Defendant Hatter was the true author and decision-maker in these

matters. It is undisputed that Captain Pinkston advised Deputy Chief/Defendant Hatter on these matters. Plaintiff maintains that Captain Pinkston's involvement was at the direction of Chief Ramsay.

Plaintiff filed a grievance through the union grievance process. From December 8–11, 2020, a four-day arbitration hearing with a third-party neutral arbitrator was held to consider Plaintiff's grievance. The arbitrator found that Plaintiff had sent confidential documents to Sheriff Easter in violation of WPD's confidentiality agreement. The arbitrator further found that Plaintiff had demonstrated little or no regard for his obligations as a WPD detective through his regular and well-known denigrating comments made at the Training Center directed toward Chief Ramsay and the WPD executive staff. The arbitrator found that these comments were made over the course of several months and disrupted the work environment. Further, the arbitrator found that the City had proven there was just cause to terminate Plaintiff. However, the arbitrator recommended reinstating Plaintiff because there was a lack of clear notice that Plaintiff's behavior could result in termination.

City Manager/Defendant Layton reviewed and adopted the arbitrator's factual findings. However, he rejected the arbitrator's recommendation that Plaintiff be reinstated and approved Plaintiff's termination on April 28, 2021. Defendant Layton reasoned that Plaintiff was on sufficient notice that his actions could result in termination "based upon [Plaintiff's] years and level of experience, including over three years of service in the [PSB] investigating violations of these various policies, along with the repeated mentoring [he] received by Sergeant Vogel in the Training Center." Plaintiff disputes that this basis is sufficient, contending that Sergeant Vogel, Plaintiff's supervisor at the time, did not coach or mentor Plaintiff at the Training Center.

Plaintiff filed this suit on December 1, 2021. Defendants filed a motion for summary judgment before discovery commenced. The Court granted the motion in part and denied in part; after an appeal of that order, only Plaintiff's three claims against Defendants Hatter, Layton and the City remain. The three remaining claims are First Amendment retaliation against all Defendants; race discrimination against the City, and retaliation against the City. Defendants seek summary judgment in their favor on all claims. The matters are fully briefed and ripe for the Court's ruling.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[6] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[7] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[8]

---

[3] Fed. R. Civ. P. 56(a).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

### III.    Analysis

**A.    First Amendment Retaliation**

Plaintiff brings a claim of First Amendment retaliation against all three Defendnats. He contends that the City launched an investigation, suspended him, and terminated his employment and that Hatter and Layton are liable with respect to his termination. He alleges that these actions were in retaliation for sending emails in 2014 related to Ebola and reporting to Sheriff Easter and DA Benett about Chief Ramsay's testimony in the *Finch* matter.

"[T]he First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"[9] Accordingly, a government employee alleging his government employer retaliated against him for exercising his right to free speech must meet a higher burden to show their speech is protected.[10] This is because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."[11]

The Supreme Court crafted a test to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[12] The

---

[9] *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting *Lane v. Franks*, 573 U.S. 228, 235 (2014)).

[10] *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

[11] *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

[12] *Pickering*, 391 U.S. at 568.

*Garcetti*/*Pickering* test, as it is known in the Tenth Circuit, consists of five elements a plaintiff must meet to show First Amendment retaliation by a government employer, namely:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.[13]

When analyzing each of these elements, the Court must address the first three steps as "questions of law for the courts, and the last two [as] questions of fact."[14] Failure to meet even one of these elements results in dismissal of the plaintiff's claim.[15]

Defendants move for summary judgment on this claim asserting that Plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact on elements four and five of the *Garcetti*/*Pickering* test. As such, the Court will analyze elements four and five as it relates to each of Plaintiff's protected activities: his 2014 Ebola-related emails and his report to Sheriff Easter and DA Bennett about Chief Ramsay.

### 1.    Prong Four: Substantial Motivating Factor

To meet his burden under the fourth prong of the *Garcetti/Pickering* test, Plaintiff has the burden of "establishing both a detrimental employment decision (adverse employment action) and 'causation—that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.'"[16] The

---

[13] *Helget*, 844 F.3d at 1221 (10th Cir. 2017) (further citations and quotations omitted).

[14] *Id.*

[15] *See id.* at 1222 ("Because Helget's claims can be resolved at the third step of the *Garcetti/Pickering* test, we confine our review to that step.").

[16] *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (quoting *Maestas v. Segura*, 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)).

parties do not dispute that Plaintiff's termination was an adverse employment action, but dispute whether the investigation and suspension rise to the level of adverse employment actions. Because Plaintiff was suspended pending the investigation, these two actions are intertwined, and the Court will address the investigation and suspension as one.

a.    Whether the Investigation and Suspension are Adverse Employment Actions

In the context of a First Amendment retaliation claim against a public employer, an employer's action arises to an adverse employment action if the employer's specific actions would "deter a reasonable person from exercising his First Amendment rights."[17] Deprivations that "press state employees . . . to conform their beliefs and associations to some state-selected orthodoxy" raise First Amendment concerns.[18] This "pressing" can take the form of actions "less harsh than dismissal" like "promotions, transfers, recalls after layoff, and hiring decisions."[19] Plaintiff offers two bases for considering the investigation and suspension as adverse employment actions: inclusion on the WPD's *Brady/Giglio* list and listing 21 witnesses when only two were necessary.

While the investigation was pending, Plaintiff was placed on what is referred to as the *Brady/Giglio* list. Under the doctrines of *Brady/Giglio*, a prosecutor has a continuing duty to disclose information favorable to the defense.[20] The *Brady/Giglio* list that Plaintiff references is a list of WPD officers whose ability to testify as a witness at trial may be impacted because of some unfavorable information. The list is shared with prosecutors so that the prosecutor can determine if any disclosure requirements are triggered. It is undisputed that a PSB investigation based upon

---

[17] *Id.* at 1238 (alteration omitted) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1208 (10th Cir. 2007)).

[18] *Id.* at 1237(quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990)).

[19] *Id.* (quoting *Rutan*, 497 U.S. at 75).

[20] *See Kansas v. Guebara*, 318 Kan. 458, 544 P.3d 794, 813 (2024) (discussing a prosecutor's *Brady/Gilgo* disclosure to the defense).

allegations of dishonest conduct would result in the matter being raised in monthly meetings between the WPD and prosecutors with the DA's and United States Attorney's offices. It is also undisputed that being fired for lying is potentially career ending for officers who want to work at major departments. Plaintiff argues that being placed on this list made it so that he "likely could not testify" and that if the allegation of dishonesty were sustained, he "likely would not be able to find a job with any substantial law enforcement agency."[21]

But the list to which Plaintiff refers was only shared with the prosecutors for informational purposes so that those offices could determine whether the conduct Plaintiff was accused of was the type of conduct that triggered *Brady/Giglio* disclosure requirements.[22] No final decisions were made by mere inclusion on the list. Here, Plaintiff speculates that the ultimate consequences of a founded allegation of dishonesty—not being able to testify or work in law enforcement—were imposed on him by the mere inclusion on this list. But even in the light most favorable to Plaintiff, the consequences of being placed on the list are impermissibly speculative.[23]

Plaintiff also suggests the investigation was conducted in bad faith because it listed more witnesses than was required. It is uncontroverted that the official notification of investigation listed 21 witnesses, but that Sheriff Easter and DA Bennett were the only two listed witnesses who had knowledge of Plaintiff's reports about Chief Ramsay's alleged false testimony. Notices given to the 21 witnesses included a copy of the allegation against Plaintiff. Defendants present no evidence or explanation for why the initial investigation listed these additional witnesses.

---

[21] Doc. 222 at 45.

[22] Doc. 211-49, Ex. 93, at 58–59.

[23] *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003) ("If the action taken by the employer in response to the employee's speech is inconsequential or has only speculative consequences, there can be no basis for a First Amendment claim.").

"An investigation of potential misconduct . . . will generally not constitute an adverse employment action."[24] But the context of an investigation matters.[25] "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."[26] Investigations that exceed the scope of the matter to be investigated or that are unnecessarily lengthy can be considered adverse employment actions.[27]

Here, Plaintiff was subject to a wide-reaching investigation—one in which several seemingly unnecessary witnesses received a notice listing the allegation under investigation. Further, the facts underlying Plaintiff's alleged misconduct were discrete and likely ascertainable from interviewing two witnesses. Such a far-reaching investigation might deter a reasonable person from exercising their First Amendment rights. Accordingly, the Court finds that Plaintiff has come forward with evidence that creates a genuine issue of material fact as to whether the investigation and suspension constituted an adverse employment action.

Having determined that the investigation, suspension, and termination were adverse employment actions, the Court turns to the second part of the fourth prong under the *Garcetti/Pickering* test which asks whether Plaintiff's exercises of his First Amendment rights were a substantial motivating factor in the Defendants' decisions to take the adverse employment actions.[28] The Court will examine whether Plaintiff's 2014 Ebola related emails or his

---

[24] *Couch*, 587 F.3d. at 1243.

[25] *Id.* at 1238 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).

[26] *Burlington N.*, 548 U.S. at 59 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)).

[27] *See Owens v. Unified Gov't of Wyandotte Cnty.*, 2022 WL 2131117, at *8 (D. Kan. Jun. 14, 2022).

[28] *Couch*, 587 F.3d at 1236.

communication to Sheriff Easter were substantial motivating factors in Defendants' decision to take adverse action against Plaintiff.

b.   Whether the Ebola emails were a Substantial Motivating Factor

In 2014, while Plaintiff was still on the PSB, he sent an email to Defendant Layton and the City Council elucidating his concerns in light of the then-recent Ebola outbreak and a trip by the City Council to Africa. Defendant Layton testified that he has no memory of this email. There is no evidence that the emails that Plaintiff sent in 2014 regarding Ebola played any role in any Defendants' decisions to investigate, suspend, or terminate Plaintiff. Plaintiff seems to argue that the investigation, suspension, and termination were temporally related to his 2014 emails. He *seems* to make this argument because, immediately after a heading contending that he was retaliated against for his Ebola emails, he cites *Roberts v. Winder*[29] for the proposition that "temporal proximity between the speech and the challenged action and evidence that the employer expressed opposition to the employee's speech" are relevant factors to consider.[30] But, plainly, a passage of five years between the emails and the adverse employment actions does not constitute temporal proximity.

Plaintiff's only other argument causally connecting his 2014 Ebola emails to his investigation, suspension, and termination is his assertion that Deputy Chief Givens held some animosity toward him over the emails. He attempts to support this assertion by pointing out that, as part of an interview during an investigation related to Plaintiff's wife, Deputy Chief Givens expressed concern over Plaintiff's 2014 Ebola emails.[31] Deputy Chief Givens also identified

---

[29] 16 F.4th 1367 (10th Cir. 2021).

[30] *Id.* at 1382 (quotation marks and citation omitted).

[31] Doc. 211-41, Ex. 85, at 4–7.

Plaintiff as the author of an email sent by a "Daisy Smith" about a meeting of black WPD officers. Deputy Chief Givens concluded that Plaintiff was "Daisy Smith" because she saw that the emails matched the pattern of Plaintiff's Ebola email.[32] Plaintiff tries to connect Deputy Chief Givens's animosity to Defendants' actions by pointing out that Deputy Chief Givens was the complainant in his investigation. But Plaintiff offers no evidence or argument that Deputy Chief Givens's animosity should be transferred and attributed to Defendants Hatter, Layton, or the City. Without any connection or evidence otherwise, Plaintiff has not come forward with evidence giving rise to a genuine issue of material fact as to whether Defendants were motivated to take any action against Plaintiff because of his 2014 Ebola emails. As such, Plaintiff does not meet his burden under the fourth prong of the *Garcetti/Pickering* test on this claim. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that they engaged in retaliation in violation of the First Amended based upon his 2014 Ebola emails.

### c. Whether Plaintiff's Reports to Sheriff Easter and DA Bennett were a Substantial Motivating Factor

Plaintiff submits that the temporal proximity between the investigation and suspension that led to termination and his communications with Sheriff Easter and DA Bennett are sufficient to satisfy the causal element of prong four. As discussed above, "temporal proximity between the speech and the challenged action and evidence that the employer expressed opposition to the employee's speech" are relevant factors to consider.[33] Here, the investigation began within three weeks of Plaintiff's communications with Sheriff Easter. Further, it is undisputed that the investigation was initiated explicitly to investigate the nature of those communications. Viewed in

---

[32] Doc. 211-33, Ex. 76, at 20–21.

[33] *Roberts*, 16 F.4th at 1382 (quotation marks and citation omitted).

the light most favorable to Plaintiff, this is enough to raise a genuine issue of material fact as to whether these communications were a substantial motivating factor in the decision to investigate, suspend, and eventually terminate Plaintiff's employment. Having found that Plaintiff's 2014 Ebola-related emails were not a substantial motivating factor in the decisions to investigate, suspend, or terminate Plaintiff, the Court will only address the fifth prong of the *Garcetti/Pickering* test as it relates to Plaintiff's communications with Sheriff Easter.

### 2.      *Prong Five: Same Decision Defense*

Prong five of the *Garcetti/Pickering* test asks whether the employer would have taken the same action in the absence of Plaintiff's protected activity.[34] Defendants bear the burden of proof at this step [35] to show that they would have made the same decision in the absence of Plaintiff's communications.[36] "Summary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."[37] Plaintiff asserts that Defendants cannot show that they would have made the same decisions regardless of his protected speech. He presents two reasons for this conclusion: first, that LT Mumma continued the investigation even after he had learned that Plaintiff had told Sheriff Easter about his previous communication with DA Bennett; and second, the Defendants lack credibility. The Court will address each in turn.

The investigation began with the charge of conduct unbecoming in departing from the truth. Notice was served on Plaintiff on December 6, 2019. Plaintiff argues that "Mumma was

---

[34] *Helget*, 844 F.3d at 1221 (citation omitted).

[35] *Roberts*, 16 F.4th at 1383.

[36] *See Helget*, 844 F.3d at 1221 (citation omitted).

[37] *Leone v. Owsley*, 810 F.3d 1149, 1153–54 (10th Cir. 2015) (alterations and citation omitted).

ordered to continue with an investigation of Plaintiff after Plaintiff promptly demonstrated the basis for the investigation was false."[38] He provides no citation to any statement of fact for this proposition and the Court could find no statement of fact that supports the proposition that Mumma was ordered to continue the investigation. However, in the light most favorable to Plaintiff, the fact that Captain Pinkston was very involved in advising on the investigation and considered himself to be doing so at Chief Ramsay's request raises questions about whether the investigation would have continued even after Plaintiff provided this information.

Plaintiff next contends that Defendants lack credibility. Specific to Defendant Hatter, Plaintiff contends that she was not the real decision maker but rather acted under the influence of Captain Pinkston and Chief Ramsay. As discussed above, Plaintiff has come forward with evidence that Captain Pinkston aided Defendant Hatter in reviewing the investigation and making decisions. Further, he has come forward with evidence that Captain Pinkston was involved at the request of Chief Ramsay. Accordingly, there is a genuine issue of material fact as to whether Defendant Hatter would have made the same decision absent Captain Pinkston's assistance with the matter.

Plaintiff asserts that Defendant Layton also lacks credibility because Defendant Layton relied upon Sergeant Vogel's arbitration testimony which is inconsistent with a summary of his testimony during the PSB interview. Recall that one reason Defendant Layton did not reinstate Plaintiff was that Sergeant Vogel had coached and mentored Plaintiff. This is consistent with the arbitrator's summary of Sergeant Vogel's testimony: "Vogel 'tried to do a lot of coaching and mentoring' of [Plaintiff] to avoid formal discipline of an experienced senior detective."[39] This

---

[38] Doc. 222 at 45.

[39] Doc. 200-34, Ex. 33, at 25.

stands in contrast to the summary of Sergeant Vogel's testimony during the PSB interview which states "Sergeant Vogel was not aware of any problems for which [Plaintiff] has been coached or mentored."[40] These statements raise obvious questions about how and whether Sergeant Vogel mentored and coached Plaintiff.

Because Defendants bear the burden at step five, they must come forward with evidence "so powerful that no reasonable jury would be free to disbelieve it."[41] Because of the diametrically opposed nature of the testimony related to one of the primary reasons Plaintiff was not reinstated, a reasonable jury may be able to disbelieve that Defendant Layton and the City would have taken the same action against Plaintiff in the absence of his protected activity. Accordingly, the Court finds that Plaintiff has come forward with evidence that would allow a reasonable jury to disbelieve Defendants' arguments, and the Court must deny Defendants summary judgment on Plaintiff's First Amendment retaliation claim.

### 2.    *Summary of First Amendment Retaliation Claim*

In sum, with regard to Plaintiff's First Amendment retaliation claim against Defendants, the Court finds that Plaintiff has demonstrated genuine issues of material fact exist as to (1) whether the suspension and investigation were adverse employment actions; and (2) whether Plaintiff's communication to Sheriff Easter about Chief Ramsay was a substantial motivating factor in their decision to take adverse action against Plaintiff; and (3) whether Defendants would have taken the same action in the absence of his communications with Sheriff Easter. Thus, the Court denies summary judgment on Plaintiff's First Amendment retaliation claim related to his communications to Sheriff Easter. The Court grants summary judgment to Defendants on

---

[40] Doc. 200-19, Ex. 18, at 77.

[41] *Leone*, 810 F.3d at 1154.

Plaintiff's claim that they took adverse employment action against him in retaliation for his 2014 Ebola emails.

## B.     Title VII & KAAD Race Discrimination

In his second cause of action Plaintiff alleges that the City discriminated against him based upon his race by conducting an investigation of him, suspending him, and ultimately terminating his employment in violation of Title VII and the KAAD. Kansas "[c]ourts analyze KAAD discrimination claims using the same analysis governing federal Title VII."[42] As such, the Court will address Plaintiff's race discrimination claims, brought under these separate statutes, together.

Title VII prohibits employers from intentionally discriminating against their employees on the basis of race.[43] To establish a race discrimination claim, a plaintiff may rely on direct allegations of intentional discrimination or the familiar *McDonnel Douglas Corporation v. Green*[44] burden shifting-framework. This three-step inquiry places the initial burden of establishing a prima facie case on the plaintiff.[45] To make a prima facie showing of race discrimination, a plaintiff must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he is qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class.[46] To make a prima facie showing at step one is "not onerous."[47] A plaintiff must only produce enough evidence to support an inference of discriminatory motive.[48] If the

---

[42] *Mitchem v. Sleepcair, Inc.*, 2021 WL 4439406, at *5 (D. Kan. Sept. 28, 2021) (citing *Singh v. Cordle*, 936 F.3d 1022, 1039, 1042 (10th Cir. 2019)).

[43] *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (citing 42 U.S.C. § 2000e–2(a)(1)).

[44] 411 U.S. 792 (1973).

[45] *Id.* at 802.

[46] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

[47] *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

[48] *Ames*, 605 U.S. at 308.

plaintiff makes a prima facie case, the burden shifts to the employer at the second step to show some legitimate, nondiscriminatory reason for its decision.[49] If the employer provides such a justification, at the third step, the burden shifts back to the plaintiff to show that the stated justification was a pretext for discrimination.[50]

Plaintiff is a white male. The parties only dispute the fourth element of Plaintiff's prima facie case: that he was treated less favorably than other non-white employees. Plaintiff proffers that three non-white employees were treated more favorable than him. Those three employees are K.G., K.H., and Sergeant Vogel.

K.G. is an Asian American officer. He was investigated by the PSB for using a fictitious name to book multiple tee-times around his own tee-time at a city golf course so that he could play through the course faster. Like K.G., Plaintiff was investigated by the PSB. He was not terminated, but unlike Plaintiff, he admitted to his misconduct and apologized in person. As such, he is an insufficient comparator to demonstrate disparate treatment.

K.H. is an African American officer. He was investigated by the PSB for releasing a juvenile human-trafficking victim back to the suspected traffickers. He was accused of lying during the investigation. After a due process hearing, like Plaintiff, K.H.'s accusation was modified. It was modified from dishonesty to failing to oversee an investigation properly. K.H. was not terminated. However, only one accusation was sustained against K.H., unlike Plaintiff who had several allegations sustained by Deputy Chief/Defendant Hatter. As such, K.H. is an insufficient comparator.

---

[49] *Id.* at 309.

[50] *Id.*

Sergeant Vogel is Asian-American. Vogel was not investigated, nor accused of dishonesty except by Plaintiff. Plaintiff cites the discrepancy between Sergeant Vogel's PSB testimony and testimony at the arbitration hearing related to the mentoring and coaching Plaintiff received as an incident of dishonesty. Although there is an apparent inconsistency in the two statements, even in the light most favorable to Plaintiff, it cannot be said that this "dishonesty" is similar to the concern that initiated Plaintiff's investigation—that Plaintiff had withheld information from Sheriff Easter in an attempt to get Chief Ramsay investigated and charged with a crime. As such, Sergeant Vogel is an insufficient comparator.

Although Plaintiff's burden is not onerous at this stage, none of his comparators were accused of similar conduct; namely being dishonest in an attempt to get Chief Ramsay investigated. None of the comparators were accused or sustained for multiple violations. Without these individuals engaging in similar conduct and being sustained for multiple offenses, there is no useful comparison to be drawn that would give rise to an inference of discrimination. Further, the only actor to which Plaintiff ascribes racial animus is Deputy Chief Givens. But Plaintiff provides no explanation for how Deputy Chief Givens's racial animus (which in itself is speculative at best) is attributable to any other actor or the City. Accordingly, the Court finds that Plaintiff does not meet element four of his prima facie case of race discrimination. Nevertheless, even if he met his prima facia burden, Plaintiff cannot satisfy his burden at step three of the *McDonnel Douglas* framework.

Before reaching step three, however, at step two the City has the burden of proffering a legitimate non-discriminatory reason for its actions. The City maintains that Plaintiff was investigated for the initial allegation that he was dishonest with Sheriff Easter. That investigation uncovered the additional allegations for which Plaintiff was eventually terminated. Namely,

Plaintiff shared confidential documents in violation of WPD policy and making disparaging comments about Chief Ramsay to his fellow employees which caused a disruption of the workplace. These are legitimate non-discriminatory reasons for the City's actions.

At step three, Plaintiff has the burden of showing that the City's proffered reason for its action was pretextual.[51] "A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons."[52]

As discussed above, Plaintiff has no useful comparators. In addition, outside of the allegation that Deputy Chief Givens holds racial animus toward him, he has no evidence of racial animus toward any other actor. Further, the decision to terminate Plaintiff went through several processes, none of which raise an inference that any actor was motivated by racial bias. First, Plaintiff was given a due process hearing after Defendant Hatter recommended termination. After that hearing, similar to one of the comparators Plaintiff proffers, Plaintiff's dishonesty allegation was modified. After Defendant Hatter recommended termination to Defendant Layton there was an arbitration hearing. There, Plaintiff had a FOP representative present and was afforded an opportunity to make arguments on his behalf. Although, as discussed above, Plaintiff has raised a factual dispute as to whether these processes were tainted by retaliatory motives in violation of the First Amendment, he has not presented evidence that they were tainted by racial animus. Plaintiff's arguments otherwise are unsupported, speculative, and insufficient to carry his burden at this stage

---

[51] *Id.*

[52] *Herrera v. United Airlines, Inc.*, 754 F. App'x 684, 691–92 (10th Cir. 2018) (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

in the litigation. Accordingly, the Court grants summary judgment in favor of the City on Plaintiff's race discrimination claims.

## C.    Title VII & KAAD Retaliation

Plaintiff's final cause of action alleges that the City retaliated against him by launching the investigation, suspending him, and terminating him because of his wife, Sarah Oldridge's protected activities. He brings these allegations under both Title VII and KAAD, which the Court addresses together.[53] When there is no direct evidence of retaliation, a claim brought under Title VII follows the same *McDonnel Douglas* three-step burden-shifting analysis.[54] At the first step, a prima facie case of retaliation is shown when a plaintiff shows "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[55] Retaliation claims may be made out when a plaintiff's close family member works for the same employer and has engaged in protected activity.[56] The parties' dispute lies in element three of Plaintiff's prima facie case, the causal connection.

The City contends that Plaintiff cannot show there was any nexus between his wife's protected activity and Plaintiff's investigation, suspension, and termination. Plaintiff makes a three-sentence response to the City's argument. In that response, Plaintiff contends that Deputy Chief Givens and LT Mumma bore animosity toward him because of his wife's protected activities. But as discussed above, even if he could show that Deputy Chief Givens bore animosity

---

[53] *Mitchem*, 2021 WL 4439406, at *5 (citing *Singh*, 936 F.3d at 1039, 1042).

[54] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (citation and alteration omitted).

[55] *Id.*

[56] *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174–75 (2011).

toward him because of his wife's protected activity, he has not provided any evidence that this animosity was transferred to any of the City's decision-makers.

Regarding LT Mumma, it is uncontroverted that LT Mumma included a summary of Sarah Oldridge's complaint against the City in his investigation of Plaintiff. But it is also uncontroverted that Plaintiff requested there be an investigation into the retaliation he perceived based upon his wife's activities. Plaintiff offers no other evidence of retaliation.

As with Deputy Chief Givens, the alleged animosity born by LT Mumma is not causally connected to the City's actions. This is especially so when considering the robust follow-on processes Plaintiff was afforded and separate decision makers for which Plaintiff provides no evidence of retaliatory motive. Accordingly, Plaintiff has not come forward with evidence to raise a genuine issue of material fact related on his retaliation claim.

Even if he had, the City has offered a legitimate, non-retaliatory reason for its actions and Plaintiff offers no evidence to show that this reason was pretextual. Accordingly, the City is entitled to summary judgment on Plaintiff's retaliation claims brough under Title VII and KAAD.

**IT IS THEREFORE ORDERED** that the Defendants' Motion for Summary Judgment (Doc. 199) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED**.

Dated this 1st day of July 2026.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-24-